**12-1727-cv(L)**
***Mashantucket Pequot Tribe v. Town of Ledyard***

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term, 2012

(Argued: March 18, 2013     Decided: July 15, 2013)

Docket Nos. 12-1727-cv(L), 12-1735-cv(CON)

---

MASHANTUCKET PEQUOT TRIBE,

*Plaintiff-Appellee*,

-v.-

TOWN OF LEDYARD; PAUL HOPKINS, Tax Assessor, Town of
Ledyard; JOAN CARROLL, Tax Collector, Town of Ledyard,

*Defendants-Appellants,*

STATE OF CONNECTICUT,

*Intervenor-Defendant-Appellant.*[*]

---

Before:
   JACOBS, *Chief Circuit Judge*, CABRANES AND WESLEY, *Circuit Judges.*

---

The Town of Ledyard and State of Connecticut appeal from the
judgment of the United States District Court for the
District of Connecticut (Warren W. Eginton, *Judge*), holding
that (1) nothing barred the court from exercising

---

[*] The Clerk of the Court is directed to amend the caption as
listed above.

jurisdiction and (2) Connecticut's personal property tax, as applied to vendors leasing slot machines to the Mashantucket Pequot Tribe for use at Foxwoods casino, was barred by the Indian Trader Statutes, Indian Gaming and Regulatory Act, and pursuant to the balancing test enunciated in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980). We hold that the district court (1) appropriately reached the merits of the case but (2) erred by finding the tax to be preempted.

REVERSED and REMANDED.

––––––––––––––––––––

ERIC D. MILLER (Benjamin S. Sharp, Jennifer A. MacLean, *on the brief*), Perkins Coie LLP, Seattle, WA and Washington, D.C., *for Defendants-Appellants Town of Ledyard, Paul Hopkins, and Joan Carroll.*

ROBERT J. DEICHERT, Assistant Attorney General, *for* George Jepsen, Attorney General of the State of Connecticut, Hartford, CT, *for Intervenor-Defendant-Appellant State of Connecticut.*

SKIP DUROCHER (Mary J. Streitz, James K. Nichols, *on the brief*), Dorsey & Whitney LLP, Minneapolis, MN, *for Plaintiff-Appellee Mashantucket Pequot Tribe.*

––––––––––––––––––––

WESLEY, *Circuit Judge*:

The Mashantucket Pequot Tribe (the "Tribe") challenges the Town of Ledyard's (the "Town") imposition of the State of Connecticut's (the "State") personal property tax on the lessors of slot machines used by the Tribe at Foxwoods

2

Resort Casino and MGM Grand at Foxwoods (collectively "Foxwoods"), located in Ledyard, Connecticut. *See* Conn. Gen. Stat. §§ 12-40 *et seq.* (the "tax"). The Tribe filed complaints in August 2006 and September 2008 on behalf of two vendors who lease slot machines to the Tribe for use at Foxwoods. The Town and the State appeal from a ruling of the United States District Court for the District of Connecticut (Warren W. Eginton, *Judge*) denying their motions for summary judgment, granting summary judgment to the Tribe, and affording the Tribe injunctive and declaratory relief.

As a threshold matter, the Town and State assert that (1) the Tribe lacks standing; (2) the Tax Injunction Act, 28 U.S.C. § 1341, strips federal courts of jurisdiction over this action; and (3) principles of comity bar federal courts from deciding this action. On the merits, the Tribe defends the district court's order to invalidate the State's personal property tax as applied to the vendors, asserting that the tax is preempted (1) by the Indian Trader Statutes, 25 U.S.C. §§ 261-64; (2) by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.;* and (3) pursuant to the balancing test enunciated in *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136 (1980).

3

We hold that: the district court properly exercised jurisdiction, and the Tribe has standing to pursue this claim; neither IGRA nor the Indian Trader Statutes expressly bar the tax; and, under the *Bracker* test, federal law does not implicitly bar the tax because State and Town interests in the integrity and uniform application of their tax system outweigh the federal and tribal interests reflected in IGRA. The district court erred in granting summary judgment for the Tribe and in denying summary judgment for the Town and State.

**Background**

**I.      The Tax**

Connecticut imposes a generally-applicable personal property tax for the purpose of revenue collection for the municipalities that assess and collect the tax.  State law requires nonresident owners of personal property, which includes slot machines, to file declarations spelling out the value of their property with the towns where their property is located.  The towns apply a formula to the value of that property and bill the owners accordingly.  Conn. Gen. Stat. § 12-43.  To collect the tax, the Town relies

4

heavily on "the willingness of taxpayers to comply with State law and file personal property declarations." Hopkins Decl. ¶ 8. This tax does not apply to Tribal property located on-reservation.

Connecticut's towns use these tax proceeds "to fund the operation of municipal government." *Id.* ¶ 5. The services provided by the Town include, *inter alia*, police and emergency-services functions, road maintenance, education, and trash collection. The Town maintains roads to and throughout the Indian reservation, provides emergency services to the Tribe, buses children living on-reservation to schools, and pays for the education of Tribal children on-reservation. The annual cost to the Town of educating Tribal children is at least $236,258.[1]

## II.     The Gaming Procedures

The Mashantucket Pequot Gaming Enterprise (the "Enterprise") operates Foxwoods, the self-described largest casino and resort in the United States. The Enterprise employs 10,000 people, of whom approximately 150 are Tribal members. Although the Tribe has other sources of income,

---

[1] The Town actually spends approximately $652,158 per annum, but it receives approximately $415,900 in federal aid, leaving the Town with $236,258 in non-reimbursed costs.

including at least four types of taxes it imposes on on-reservation activities, the majority of the Tribe's revenue comes from the Enterprise. Slot machines are among the most popular Enterprise games.

IGRA defines slot machines as Class III games. *See* 25 C.F.R. § 502.4. The Final Mashantucket Pequot Gaming Procedures, promulgated by the Secretary of the Interior, governs the Tribe's use of Class III games. *See* Dist. Ct. Doc. No. 221-13, 56 Fed. Reg. 24996 (1991), 56 Fed. Reg. 15746-01 (1991) ("Gaming Procedures"). Under the Gaming Procedures, the State licenses gaming employees, requires enterprises to register before providing gaming, and collects compensation from the Tribe. Gaming Procedures at §§ 5-6. The Enterprise pays twenty-five percent of all proceeds from video facsimile games[2] to the State. These payments exceeded $1.5 billion from 2003 to 2011. The Enterprise also "reimburse[s] the State for law enforcement and regulatory services related to [] gaming;" this payment was, in total, approximately $56.8 million from 2003-2011.

**III.      The Lease Agreements and Modifications**

The Enterprise obtains slot machines from different vendors, including Atlantic City Coin & Slot Company ("AC

---

[2] Slot machines are included among "video facsimile games."

Coin")[3] and WMS Gaming Incorporated ("WMS") (collectively

the "vendors").  AC Coin is incorporated and based in New

Jersey; WMS is a Delaware corporation with headquarters in

Illinois.  AC Coin and WMS sell some of their slot machines,

but they offer some of their most popular proprietary games

by lease only.[4]

AC Coin began leasing slot machines to the Tribe in

1997-98.  These leases provided that "[t]axes and any

license fees applicable to the use and operation of the

[machines] shall be paid by [the] [c]asino."  AC Coin Lease

10/11/2000.  The agreements further provided that the Tribe:

> agrees to defend, indemnify, and hold harmless A.C.
> Coin, its agents, employees, officers, and directors
> from and against any and all liabilities,
> obligations, losses, damages, injuries, claims,
> demands, penalties, costs and expenses . . . of
> whatsoever kind or nature . . . arising out of the
> use, operation and possession of the [machines],
> provided such liabilities are not the direct result
> of the negligent or intentional conduct of A.C. Coin
> or its agents, officers, and directors.

*Id.*  "AC Coin has used, and continues to use, this standard

form tax and indemnification language . . . in leases for

---

[3] On June 27, 2013, the Tribe notified the Court that AC Coin would cease operations on June 30, 2013.  This does not affect any of the legal analysis in this case.

[4] As of October 2009, AC Coin began to make its proprietary games available for purchase.  *See* Tribe Brief at 12.

both its tribal and non-tribal lessees."  McCormick Aff. 2. AC Coin has paid Connecticut's personal property tax on slot machines leased to the tribes that operate both Foxwoods and Mohegan Sun, another Connecticut-based, Indian-run casino. Despite the permissive language in its leases, AC Coin has not sought or received reimbursement for the taxes that it has paid on gaming equipment leased to other casinos and had not sought reimbursement from the Tribe prior to this lawsuit.

WMS also leased slot machines to the Tribe pursuant to standard form leases, beginning in 1998.  A 1998 lease with the Tribe contained standard language requiring that:

> [t]axes, licenses and permit fees applicable to the installation or operation of the [machines] shall be paid by the [Tribe]. [The Tribe] shall indemnify and defend WMS from and against any penalty, liability and expense . . . arising from [the Tribe's] failure to remit such taxes or from any delinquency with respect to such remittance.

WMS Lease Agreement 10/15/98.  Like AC Coin, WMS "has not sought reimbursement nor has it ever been reimbursed for personal property taxes it has paid on gaming equipment leased to casinos by any casino or Indian tribe, including the . . . Enterprise and the Mohegan Sun casino."  Town Rule 56(a)(1) Statement 7.  Similarly, WMS "does not change the

pricing, or lease rate, of leased slot machines because of personal property tax; the tax is not a factor in lease pricing." *Id.*

In the late 1990s, the Tribe decided that its vendors should not be subject to the tax. Despite the vendors' initial reluctance, the Tribe persuaded the vendors to modify the lease agreements to reflect this decision. The modified AC Coin lease indicated:

> Foxwoods represents that it is not subject to any state or local taxes for any services or sales or leases occurring at Foxwoods' premises and . . . AC Coin agrees not to file with the local towns or any other applicable jurisdiction, including specifically the Town of Ledyard, a list of property or equipment provided under the Agreement or to pay such tax with respect to such equipment except in the event that AC Coin is legally obligated to do so. In the event [that] AC Coin becomes legally obligated to file and/or pay taxes, AC Coin agrees to immediately notify Foxwoods of such obligation and to reasonably cooperate with Foxwoods in contesting such tax filing and/or payment if so requested by Foxwoods . . . . Foxwoods agrees to hold harmless and/or reimburse AC Coin within thirty (30) days for any taxes or any related cost or expense paid in accordance with this provision.

Town Rule 56(a)(1) Statement 4-5.

The modified language in the WMS lease agreement was substantially identical. *See id.* Despite the modifications, WMS and AC Coin continued to pay personal property taxes until the Tribe pressured them to stop.

9

**IV.      Court Actions among the Parties**

In 2006, AC Coin pursued and lost an administrative appeal of the tax to the Town's Board of Assessment Appeals. In August 2006, the Tribe and AC Coin filed the complaint in this action in the United States District Court for the District of Connecticut.

In July 2008, the Town filed suit in Connecticut Superior Court to collect unpaid property taxes from WMS. In September 2008, the Tribe sued in federal court to enjoin the enforcement of the tax against WMS. The district court consolidated the two federal actions. The Superior Court has stayed Connecticut's action against WMS pending resolution of this case. *Town of Ledyard v. WMS Gaming*, KNL-cv08-5007839 (Conn. Sup. Ct.). The State intervened as a defendant in both federal cases. As relevant here, the parties filed cross-motions for summary judgment, which the district court resolved in favor of the Tribe.


**Discussion**

The Town and State offer three independent reasons to dismiss this case for lack of jurisdiction: (1) standing, (2) the Tax Injunction Act ("TIA"), and (3) comity. The

10

Tribe argues that jurisdiction was proper and that we should affirm the district court's opinion that the tax is preempted by (1) the Indian Trader Statutes, (2) IGRA, and (3) the *Bracker* balancing test. We find that (1) the district court properly reached the merits of the case, and (2) the district court erred in holding that the tax was preempted.

## I. The District Court Properly Exercised Jurisdiction

The district court concluded that none of the Appellants' challenges to its jurisdiction were persuasive. *See Mashantucket Pequot Tribe v. Town of Ledyard*, No. 06-cv-1212(WWE), 2007 WL 1238338, *1-2 (D. Conn. Apr. 25, 2007) ("*Pequot I*") (denying motion to dismiss based on the TIA and comity); *Mashantucket Pequot Tribe v. Town of Ledyard*, No. 06-cv-1212(WWE), 2012 WL 1069342, *5-6 (D. Conn. Mar. 27, 2012) ("*Pequot II*") (denying motion to dismiss based on the TIA and lack of standing). We affirm that conclusion.

### A. The Tribe Has Standing to Pursue Its Claim

The Town alleges that the Tribe lacks standing to bring this claim. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable

11

by a favorable ruling.'" *Clapper v. Amnesty Intern. USA*, -- U.S. --, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. --, 130 S. Ct. 2743, 2752 (2010)). Only the existence of a concrete, particularized injury is at issue in this case.

The Tribe argues, *inter alia*, that it has suffered an injury-in-fact because the tax infringes upon Tribal sovereignty. We agree that the Tribe's allegations are sufficient to confer standing.

Although Article III's standing requirement is not satisfied by mere assertions of trespass to tribal sovereignty, actual infringements on a tribe's sovereignty constitute a concrete injury sufficient to confer standing. This injury, distinct "from the monetary injury asserted by" the taxed parties, implicates "the substantive interest which Congress has sought to protect [in] tribal self-government." *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 469 n.7 (1976) (addressing state taxes imposed on on-reservation Indians directly implicating the tribe's relationship with its members). This rule exists because tribes, like states, are afforded "special solicitude in our standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

12

"The Supreme Court has consistently recognized that a tribe has an interest in protecting tribal self-government from the assertion by a state that it has regulatory or taxing authority over Indians and non-Indians conducting business on tribal reservations." *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1230 (11th Cir. 2000) (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), and *Ramah Navajo Sch. Bd. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 845 (1982)). In *Miccosukee*, the Eleventh Circuit held that a tax imposed on revenues gained by a non-Indian boxing promoter from an on-reservation match constituted an affront to sovereignty sufficient to confer standing. *Id.* at 1230-31 (collecting cases in which the Supreme Court reached the merits of similar actions).

The Town relies on *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174 (2d Cir. 1996), in which this Court held (without discussing standing) that some statutory interference with tribal sovereignty was permissible, to argue that the alleged infringement of sovereignty at issue here does not confer standing. However, we must avoid "conflat[ing] the requirement for an injury-in-fact with the

13

. . . validity of [the Tribe's] claim." *Dean v. Blumenthal*, 577 F.3d 60, 66 n.4 (2d Cir. 2009) (*per curiam*). The standing inquiry only requires that the Tribe establish "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted).

Here, the imposition of state taxes on slot machines operated only by the Tribe's casino and stored solely on-reservation impinges upon the Tribe's ability to regulate its affairs and to be the sole governmental organ influencing activities, including possession of property, on its reservation. The injury in this case is neither speculative nor generalized; there is a real tax with measurable interference in the Tribe's sovereignty on its reservation. *Miccosukee*, 226 F.3d at 1230, 1234. The Tribe has standing to vindicate these interests.

**B.   The TIA Does Not Bar This Action**

The State alleges that the Tribe's suit is barred by the TIA, which provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or

14

collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Tribe counters that a tribal exception recognized in *Moe*, 425 U.S. at 470-74, undercuts the TIA's seemingly sweeping language. We agree with the Tribe.

Federal courts "have original jurisdiction of all [federal claims] brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior." 28 U.S.C. § 1362. In *Moe,* the Supreme Court permitted a Tribe to challenge, *inter alia*, the imposition of a state personal property tax imposed on-reservation. 425 U.S. at 469. The *Moe* Court held that tribes are entitled to "treatment similar to that of the United States had it sued on their behalf." *Id.* at 474. The Court further noted that the United States could sue to vindicate Indian interests that it had sought to protect through federal legislation and federal programs. *Id.* at 473 (citing *Heckman v. United States*, 224 U.S. 413 (1912), and *United States v. Rickert*, 188 U.S. 432 (1903)). The tribe was therefore permitted to sue to dispute imposition of state personal property taxes and sales taxes as applied to on-reservation Indians. *Id.* at 474-75.

If the Tribe were suing to enjoin enforcement of a state tax imposed directly on the Tribe, the action would not be barred by the TIA. *Moe*, 425 U.S. at 472-74; *see also Sac and Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 571-72 (10th Cir. 2000). However, otherwise exempt parties are subject to the TIA when they sue on behalf of non-exempt institutions. *FDIC v. New York*, 928 F.2d 56, 59 (2d Cir. 1991). Insofar as the Tribe is suing on behalf of the third-party vendors who are the taxed parties, its suit (like theirs) is barred by the TIA.

Here, the Tribe is suing to defend against the Town's and State's alleged encroachment upon aspects of tribal sovereignty protected by the Indian Trader Statutes and IGRA. Courts "'embrace[] the recognition of the interest of the United States in securing immunity to the Indians from taxation conflicting with the measures it had adopted for their protection.'" *Moe*, 425 U.S. at 473 (quoting *Heckman*, 224 U.S. at 441). Since we are required to decide whether the state tax at issue conflicts with the federal measures enacted for the Tribe's protection, we have undoubted jurisdiction – notwithstanding the TIA - to perform that task. Recognizing this requirement, Congress bestowed on

16

the federal courts original jurisdiction over "all" federal claims brought by tribes. 28 U.S.C. § 1362. The TIA does not preclude jurisdiction over a tribe's suit to enjoin purportedly preempted state taxation of non-Indians on the reservation. *See, e.g., Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1186 n.1 (9th Cir. 2008).[5]

### C. Comity Does Not Preclude Federal Jurisdiction

The State alleges that the district court abused its discretion in failing to dismiss this case under principles of comity. The Tribe asserts that the State forfeited this claim. We reject both arguments: the State adequately preserved its comity objection, but the district court was within its discretion in denying the motion to dismiss. *See Joseph v. Hyman*, 659 F.3d 215, 218 n.1 (2d Cir. 2011) ("where, as here, a district court dismisses the action based on comity, we review the decision for abuse of discretion").

---

[5] The State's reliance on *United States v. Jicarilla Apache Nation*, -- U.S. --, 131 S. Ct. 2313 (2011), is misplaced. *Jicarilla* addresses the fiduciary exception to the attorney-client privilege as related to the United States in its trustee relationship with Indian tribes. The opinion relies on analysis of the evidentiary privilege and the relationship between the United States and Indian tribes; neither is directly at issue here. *Id.*

17

The Tribe points to cases in which courts have held that arguments raised in the complaint were waived unless reiterated in opposition to motions for summary judgment. Tribe Br. 41 (citing, *inter alia*, *Rocafort v. IBM Corp.*, 334 F.3d 115, 121 (1st Cir. 2003)). These cases are unpersuasive in the context of "comity and federalism[, which] bear on the relations between court systems, [because] those relations will be affected whether or not the litigants have raised the issue themselves." *Washington v. James*, 996 F.2d 1442, 1448 (2d Cir. 1993). Moreover, the district court considered and rejected the comity challenge prior to the motion for summary judgment. "After [the] final order, the district court's earlier denial of the motion to remand for lack of subject matter jurisdiction also is reviewable." *Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 488 (D.C. Cir. 2009) (citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3740 (3d. ed. 1998)). "To require [the State] to re-raise [its] objections would be an overly formalistic application of waiver." *Dexia Credit Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010).

18

"More embracive than the TIA, the comity doctrine applicable in state taxation cases restrains federal courts from entertaining claims for relief that risk disrupting state tax administration."  *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 130 S. Ct. 2323, 2328 (2010).  The practical reasons for the stringent application of comity in the context of state tax law were explained by Justice Brennan:

> The special reasons justifying the policy of federal non-interference with state tax collection are obvious. . . . If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law.  During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.  Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts.

*Perez v. Ledesma*, 401 U.S. 82, 128 n.17 (1971) (concurring in part and dissenting in part).  Recognizing the competence of the state courts to adjudicate federal issues "is essential to 'Our Federalism,' particularly in the area of state taxation."  *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 103 (1981).

19

There is little precedent for applying the comity doctrine in cases brought by Indian tribes. *Cf. Kiowa Tribe of Oklahoma v. Lewis*, 777 F.2d 587, 592 (10th Cir. 1985) (affirming the dismissal, on res judicata grounds, of an issue that had already been litigated and appealed through the entire Kansas state court system). The Sixth Circuit has upheld the dismissal on comity grounds of a lawsuit brought by a private Indian enterprise. *Chippewa Trading Co. v. Cox*, 365 F.3d 538, 544-46 (6th Cir. 2004). However, in so holding, the court explicitly relied on the fact that the plaintiff "[wa]s not an 'Indian tribe or band,' as the statutory exception [to the TIA] requires." *Id.* at 545. *Cf. Winnebago Tribe of Neb. v. Kline*, 297 F. Supp. 2d 1291, 1301 (D. Kan. 2004).

Two factors counsel against dismissing due to comity in this case, brought by an actual Indian tribe and not yet litigated in state court.[6] First, there are strong federal interests in determining the contours of the Indian Trader Statutes and IGRA, two federal regulatory regimes that entirely occupy (and preclude state legislation in) fields

---

[6] If the Town had brought suit in state court to collect unpaid taxes prior to – instead of two years after – commencement of this action, the argument for federal deference to the pending state action would be stronger.

of indeterminate size.  Where Congress has determined that there are "strong policies . . . favoring a federal forum to vindicate deprivations of federal rights," as in the context of litigation brought by Indian tribes, federal courts should exercise their lawful jurisdiction.  *McNary*, 454 U.S. at 119 (Brennan, *J.*, concurring).  Second, federal courts have regularly entertained Indian tribes' challenges to state taxes.  *See, e.g., Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 138 (1980); *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154 (2d Cir. 2011). Seeing no reason to depart from this precedent, we affirm the denial of the motion to dismiss on comity grounds.[7]

## II.        The State Tax Has Not Been Preempted

On reaching the merits, the district court held that the tax was preempted by the Indian Trader Statutes, by IGRA, and pursuant to the *Bracker* balancing test.  *Pequot II*, 2012 WL 1069342, at *7-12.  We conclude that neither the Indian Trader Statute nor IGRA preempts the tax "expressly or by plain implication," *Cotton Petroleum Corp. v. New*

---

[7] The State views the district court's decision not to dismiss due to comity as an abuse of discretion, despite the fact that such a decision would have made it the first federal court to dismiss an Indian tribe's challenge of a state tax on comity grounds.

21

*Mexico*, 490 U.S. 163, 175-76 (1989), and that the Town and State interests in the tax, as applied to the vendors, outweigh the Tribe and federal interests.  The tax is not preempted.

"'In determining whether federal law preempts a state's authority to regulate activities on tribal lands, courts must apply standards different from those applied in other areas of federal preemption.'" *Confederated Tribes of Siletz Indians of Or. v. Oregon*, 143 F.3d 481, 486 (9th Cir. 1998) (quoting *Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430, 433 (9th Cir. 1994)).  "Although a State will certainly be without jurisdiction if its authority is preempted under familiar principles of preemption, we . . . d[o] not limit preemption of State laws affecting Indian tribes to only those circumstances." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333-34 (1983).

When examining whether a state tax is permissible, "the initial and frequently dispositive question in Indian tax cases is who bears the legal incidence of the tax, [as] the States are categorically barred from placing the legal incidence of an excise tax on a tribe or on tribal members for sales made inside Indian country without congressional

22

authorization." *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005) (internal quotation, alterations, and emphasis omitted).  But here, the parties stipulate that the legal incidence of the tax falls on the vendors.  The Supreme Court in *White Mountain Apache Tribe v. Bracker* laid out a mode of analysis for courts to use "where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation."  448 U.S. 136, 145 (1980); *see also Wagnon*, 546 U.S. at 102.  Under *Bracker*, a state tax may be invalid because it is "pre-empted by federal law," or because it "unlawfully infringe[s] on the right of reservation Indians to make their own laws and be ruled by them."  *Id.* at 143 (internal quotation marks omitted).

In our view, neither the Indian Trader Statutes nor IGRA indicates congressional intent to bar the tax, and subjecting the "tax scheme over on-reservation, non-member activities to 'a particularized inquiry into the nature of the state, federal, and tribal interests at stake'" leads us to conclude that the tax is a valid exercise of State authority.  *Oneida Nation*, 645 F.3d at 165 (quoting *Bracker*, 448 U.S. at 145).

23

## A. The Indian Trader Statutes Do Not Bar This Tax

The Tribe argues that the Indian Trader Statutes, 25 U.S.C. §§ 261 *et seq.*, bar any state regulation in "the field of transactions with Indians occurring on reservations." *Central Machinery Co. v. Ariz. State Tax Comm'n*, 448 U.S. 160, 165 (1980). Adopting a broad view of the Indian Trader Statutes, the district court held that "the state tax that is imposed upon the non-Indian entities for the . . . leased equipment is preempted by the Indian Trader Statutes." *Pequot II*, 2012 WL 1069342, at *7. We disagree.[8]

"Throughout this Nation's history, Congress has authorized 'sweeping' and 'comprehensive federal regulation' over persons who wish to trade with Indians and Indian tribes." *Dep't of Taxation and Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 70 (1994) (quoting *Warren Trading Post Co. v. Ariz. State Tax Comm'n*, 380 U.S. 685,

---

[8] The State and Town argue that IGRA has displaced the Indian Trader Statutes with respect to gaming operations. While this argument has some force, given that IGRA *does* provide "room" for state regulatory authority over gaming, *cf. Central Machinery*, 448 U.S. 166 ("no room" for state regulation under Indian Trader Statutes), we need not address that argument here. Assuming *arguendo* that the Indian Trader Statutes apply, they do not preempt this generally applicable property tax assessed on non-Indian property.

687-89 (1965)). This regulation includes the Indian Trader Statutes, passed in 1834[9] "to protect Indians from becoming victims of fraud in dealings with persons selling goods." *Central Machinery*, 448 U.S. at 165. These regulations grant the federal government "sole power and authority . . . to make such rules and regulations as [it] may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U.S.C. § 261. They also prohibit unrecognized traders (such as AC Coin and WMS)[10] from trading with Indians and require "[t]hat no white person shall be employed as a clerk by any Indian trader . . . unless first licensed so to do by the Commissioner of Indian Affairs." 25 U.S.C. § 264.

The Supreme Court initially interpreted these statutes very broadly. *See Milhelm Attea*, 512 U.S. at 75; *Warren Trading Post*, 380 U.S. 685. The district court relied on this interpretation, holding that wherever a product is bought, sold, or leased by a tribe on-reservation, state

_____

[9] For a detailed discussion of the history of the Indian Trader Statutes and related statutes and laws, see *Warren Trading Post v. Arizona State Tax Commission*, 380 U.S. at 687-90.

[10] Although invited to do so by the parties, we decline to examine whether AC Coin and WMS are in criminal violation of the Indian Trader Statutes by virtue of the leases at issue.

taxes may not be applied.  *Pequot II*, 2012 WL 1069342, at *7. However, in *Milhelm Attea,* the Supreme Court backed away from this all-encompassing interpretation: "[a]lthough language in *Warren Trading Post* suggests that no state regulation of Indian traders can be valid, our subsequent decisions have undermined that proposition."  512 U.S. at 71 (internal alteration and quotation marks omitted); *see also Cotton Petroleum*, 490 U.S. at 175.  "Indian traders are not wholly immune from state regulation that is reasonably necessary to the assessment or collection of lawful state taxes."  *Milhelm Attea*, 512 U.S. at 75.

Instead of "depend[ing] on 'rigid rules' or on 'mechanical or absolute conceptions of state or tribal sovereignty,'" preemption under the Indian Trader Statutes involves "'a particularized inquiry into the nature of the state, federal, and tribal interests at stake . . . to determine whether, in the specific context, the exercise of state authority would violate federal law.'"  *Milhelm Attea*, 512 U.S. at 73 (quoting *Bracker*, 448 U.S. at 142, 145) (alteration omitted).  Thus where they are implicated, the Indian Trader Statutes require the *Bracker* balancing analysis.

26

The ability of a state to apply generally-applicable taxes to non-Indians performing otherwise-taxable functions on an Indian reservation is well established. *Oneida Nation*, 645 F.3d at 167; *Milhelm Attea*, 512 U.S. at 73; *Cotton Petroleum*, 490 U.S. at 191. Neither the Tribe's interests in economic development and fair dealing nor the federal interests in protecting the Tribe by monitoring and regulating its commercial partners are implicated by Connecticut's generally-applicable personal property tax. *See Colville*, 447 U.S. at 156-57. That is particularly true here, where the incidence of the generally applicable tax falls on the non-Indian's *ownership of property*, rather than on the *transaction* between the Tribe and the non-Indian. *Cf. Central Machinery*, 448 U.S. at 165 (Indian trader law "pre-empts the field of *transactions* with Indians" (emphasis added)). As a result, the Indian Trader Statutes do not preempt the personal property tax "expressly or by plain implication." *Cotton Petroleum*, 490 U.S. at 175-76.

**B. IGRA Does Not Bar the Tax**

The district court also determined that IGRA preempts the tax. *Pequot II*, 2012 WL 1069342, at *7-9. The Tribe is of the view that IGRA completely preempts all state

27

legislation affecting the field of gaming. While the Tribe is correct that IGRA preempts certain state regulations affecting the governance of gaming, the tax at issue here does not affect the Tribe's "governance of gaming" on its reservation, *see, e.g., Barona Band*, 528 F.3d at 1192. Therefore, we conclude that IGRA does not preempt the tax.

### 1. The Plain Text of IGRA Does Not Bar the Tax

The plain text of IGRA does not bar the tax. IGRA insists that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4). IGRA does confer the authority, however, for states and tribes to include provisions in the Gaming Procedures, "relating to . . . assessment[s] by the State of . . . amounts [] necessary to defray the costs of regulating [Class III] activity." 25 U.S.C. § 2710(d)(3)(C)(iii).

In this case, the Gaming Procedures are silent as to the legality of Connecticut's generally-applicable personal property tax. Neither the State nor the Tribe sought to

28

include language relating to the personal property tax in the Gaming Procedures. As a result, neither the Gaming Procedures nor, by extension, IGRA explicitly forbids (or permits) the State to apply its personal property tax to the vendors.

**2. IGRA Does Not Bar the Tax by Plain Implication**

IGRA does not explicitly bar the tax, but the Tribe asserts that the provisions of IGRA demonstrate congressional intent to exempt non-Indian lessors of gaming equipment from a generally-applicable state property tax levied on property located within a reservation even though that tax does not produce acute economic effects that interfere with the relevant gaming practices. IGRA, passed in 1988 in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987),[11] was "'intended to expressly preempt the field in the governance of gaming activities on Indian lands. Consequently, Federal courts should not balance competing

---

[11] Although the *Cabazon* decision is frequently cited as the immediate cause of IGRA, Congress had been weighing similar bills for four years prior. All of these bills were designed to "establish a federal scheme that would pre-empt state regulation of Indian gaming." Alex Tallchief Skibine, *The Indian Gaming Regulatory Act at 25: Successes, Shortcomings, and Dilemmas*, 60 FED. LAWYER 35, 36 (Apr. 2013).

Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed.'" *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996) (quoting S. Rep. No. 446, 100th Cong., 2d Sess. 6 (1988)). However, "[n]ot every contract that is merely peripherally associated with tribal gaming is subject to IGRA's constraints." *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435, 439 (8th Cir. 2001).

In determining whether a state tax imposed on a third party is preempted by IGRA's occupation of the "governance of gaming" field, courts have been quick to dismiss challenges to generally-applicable laws with *de minimis* effects on a tribe's ability to regulate its gambling operations. For example, courts have held that IGRA's preemptive scope is not implicated in cases involving gaming management and service contracts with a tribe, *id.* at 438-39; contracts to acquire materials to build a casino, *Barona Band,* 528 F.3d at 1192; and release of detailed investigative reports on the management of gaming, *Siletz*, 143 F.3d at 487. Similarly, we conclude that any preemption of the "field" of gaming regulations is not at issue here, where the state tax on property is not targeted at gaming.

Instead, we apply the *Bracker* framework to determine whether the particular application of this tax conflicts with federal law. *See Barona Band*, 528 F.3d at 1193 ("If we were to accept the Tribe's argument that IGRA itself preempts the state taxation of non-Indian contractors working on tribal territory, we would effectively ignore *Bracker* and its progeny.").

The Tribe contends that, in order to assure the legality of a tax of general application, the State was required to include language in the Gaming Procedures reserving the right to apply the property tax to slot machine vendors. "[U]nder [IGRA], the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact." *Gaming Corp.*, 88 F.3d at 546. But under IGRA, *mere ownership* of slot machines by the vendors does not qualify as gaming, and taxing such ownership therefore does not interfere with the "governance of gaming."

Although the Gaming Procedures outline the Tribe's use of gaming services, nothing in the Gaming Procedures indicates that it delineates all of the rights and responsibilities of vendors engaged in gaming services.

31

"Gaming services" in the Gaming Procedures is defined as "the providing of any goods or services to the Tribe directly in connection with the operation of Class III gaming in a gaming facility, including . . . manufacture, distribution, maintenance or repair of gaming equipment." Gaming Procedures § 2(m).[12] While the Gaming Procedures prohibit State taxation of "any Tribal gaming operation" other than those explicitly permitted, Gaming Procedures § 17(f), they are silent as to taxes imposed on a third party's ownership of slot machines on the Tribe's land, which, as explained above, is not "gaming."

Absent the Gaming Procedures, IGRA would not preempt the tax. With the Gaming Procedures, which are silent on the question of state taxation of the vendors' property, the analysis is unchanged.

IGRA does not directly preempt, by its text or by plain implication, the imposition of Connecticut's generally-applicable personal property tax. It also does not

---

[12] "Gaming equipment" is separately defined to mean "any machine or device which is specially designed or manufactured for use in the operation of any Class III gaming activity." Gaming Procedures § 2(i). The "Gaming services" definition therefore includes the services of the vendors, who provide slot machines to the Tribe to be used as class III gaming devices.

32

explicitly authorize the tax; the *Bracker* balancing test is therefore in play.

**C.    The Tax Is Not Barred under *Bracker***

Even when a state law is not barred by the text or plain implication of a federal statute, "it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'"  *Bracker*, 448 U.S. at 142 (quoting *Williams v. Lee*, 358 U.S. 217, 220 (1959)); *see also Wilson*, 37 F.3d at 433.  It may also unlawfully impinge upon the objectives of federal legislation.  *See Bracker*, 448 U.S. at 149.  Such a tax is impermissible if "the imposition of the tax fails to satisfy the *Bracker* interest-balancing test."  *Wagnon*, 546 U.S. at 102.

The *Bracker* test is "a flexible pre-emption analysis sensitive to the particular facts and legislation involved." *Cotton Petroleum*, 490 U.S. at 176.  We examine "federal statutes and treaties . . . in light of 'the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.'" *Ramah*, 458 U.S. at 838 (quoting *Bracker*, 448 U.S. at 144-45).  We then weigh the "'independent but related' barriers" of (1) possible pre-emption under federal

33

statutes, and (2) "interfere[nce] with [a] tribe's ability to exercise its sovereign functions." *Id.* at 837 (quoting *Bracker*, 448 U.S. at 142). Finally, "[t]he State's interest in exercising its regulatory authority over the activity in question must be examined and given appropriate weight." *Id.* at 838. In balancing interests, "ambiguities in federal law should be construed generously, and federal pre-emption is not limited to those situations where Congress has explicitly announced an intention to pre-empt state activity." *Id.*

The Town and State contend that the balancing test does not apply and, in the alternative, that the Town and State interests at issue are more significant than the Tribal and federal interests at play. We find, first, that the *Bracker* test applies, and second, that it balances in favor of the Town and State.

### 1. The *Bracker* Test Applies

The Town makes two arguments in support of its claim that the *Bracker* test does not apply: (1) the taxed "transaction" takes place off of the reservation, and (2) any needed balancing has already been conducted by the Supreme Court in *Thomas v. Gay*, 169 U.S. 264 (1898). Neither argument is persuasive.

First, "[t]he *Bracker* interest-balancing test has never been applied where . . . the State asserts its taxing authority over non-Indians off the reservation." *Wagnon*, 546 U.S. at 110. In *Wagnon*, the Supreme Court held that a fuel tax imposed on distributors who received fuel off-reservation and delivered it to the Prairie Band Potawatomi Nation on-reservation was imposed on off-reservation transactions not subject to *Bracker*. *Id.* at 101-110. The tax at issue in *Wagnon* applied regardless of the disposition of the fuel because it was triggered by the off-reservation receipt of fuel. Here, no relevant transaction occurs off-reservation. Instead, the tax is levied upon slot machines because they are located in the State of Connecticut - here, on the Tribe's reservation. Conn. Gen. Stat. § 12-43.

Second, the Town points to several late nineteenth-century cases ("Non-Indian Lessee Cases") in which the Supreme Court upheld taxes on property of non-Indians who resided on Indian reservations. In *Thomas*,[13] the Court upheld "a tax put upon the cattle of the [non-Indian] lessees [as] too remote and indirect to be deemed a tax upon

---

[13] In other cases cited by the parties, the fact patterns and analysis mirror *Thomas*. *See Wagoner v. Evans*, 170 U.S. 588 (1898); *Utah & N. Ry. Co. v. Fisher*, 116 U.S. 28 (1885); *Truscott v. Hurlbut Land & Cattle Co.*, 73 F. 60 (9th Cir. 1896).

35

the lands or privileges of the Indians." 169 U.S. at 273. Expressly setting aside the argument that "the value of the lands for such purposes would fluctuate or be destroyed altogether" by the tax, *id.*, the Court declined to engage in a structured analysis or to weigh the tribal against the State interests.

*Thomas* and the Non-Indian Lessee Cases are similar to this case insofar as the Court addressed state taxation with the incidence of the tax falling within Indian land despite the absence of a direct tax on the Indians. *Cf. Colville*, 447 U.S. at 183-86 (Rehnquist, *J.*, concurring). However, the law has changed since the 1890s; the Supreme Court has clarified the ways in which courts should evaluate assertions of preemption of state taxes. *Bracker*, 448 U.S. at 145. "Each case 'requires a particularized examination of the relevant state, federal, and tribal interests.'" *Cotton Petroleum*, 490 U.S. at 176 (quoting *Ramah*, 458 U.S. at 838). Moreover, Congress has established the importance of the specific federal interests at issue by enacting protective legislation such as IGRA. *Cf. Thomas*, 169 U.S. at 274-75 (conceding "[t]he unlimited power of [C]ongress to deal with the Indians" but noting that the tax at issue

36

would not "be an interference with congressional power").

Although *Thomas* informs our inquiry, we cannot forgo *Bracker's* fact-specific analysis because the Supreme Court decided a related question 115 years ago.

### 2. The State and Town Interests Outweigh the Federal and Tribal Interests

#### i. The Federal Interest

For the purposes of the *Bracker* test, determining relevant federal interests "is primarily an exercise in examining congressional intent, [and] the history of tribal sovereignty serves as a necessary 'backdrop' to that process." *Cotton Petroleum*, 490 U.S. at 176. IGRA,[14] described at times as Congress's "strongest and most explicit statement in favor of tribal economic development," Matthew L.M. Fletcher, *The Supreme Court and Federal Indian Policy*, 85 NEB. L. REV. 121, 146 (2006), "is intended to promote tribal [economic] development, prevent criminal activity related to gambling, and ensure that gaming activities are conducted fairly." *Rincon Band of Luiseno Mission Indians of the Rincon Reservation v. Schwarzenegger*,

_____

[14] Because the tax in no way implicates the federal interest in ensuring that Tribes are not swindled in unfair transactions, the federal interests reflected in the Indian Trader Statutes are irrelevant. We therefore focus our inquiry on the federal interests reflected in IGRA.

37

602 F.3d 1019, 1034 (9th Cir. 2010), and also to "ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702(1)-(2). Nothing within IGRA reveals congressional intent to exempt non-Indian suppliers of gaming equipment from generally applicable state taxes that would apply in the absence of the legislation. IGRA addresses state taxation, 25 U.S.C. § 2710(d)(4),[15] without prohibiting taxes like this personal property tax. *See, e.g., Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196-97 (1983) (holding that if federal legislation speaks to a particular tax without prohibiting it, this undermines a claim that the tax is preempted).

The tax, imposed on non-Indian vendors, is likely to have a minimal effect on the Tribe's economic development. While IGRA seeks to limit criminal activity at the casinos, nothing in Connecticut's tax makes it likely that Michael Corleone will arrive to take over the Tribe's operations.

---

[15] Section 2710(d)(4) provides in relevant part that

nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity.

Moreover, IGRA presented an opportunity for Congress to preempt taxes exactly like this one; Congress chose to limit the scope of IGRA's preemptive effect to the "governance of gaming." *Gaming Corp.*, 88 F.3d at 550. As imposed on the owners of vending machines leased by the Tribe, the tax entitles the State to a tangential benefit from the Tribe's gaming operation, but it does not prevent "the Indian tribe [from being] the *primary* beneficiary of the gaming operation." 25 U.S.C. § 2702(2) (emphasis added). The tax therefore has only a minimal effect on federal interests.

## ii. The Tribal Interest

The tax implicates two Tribal interests – economic development and sovereignty over the reservation - but the parties dispute the magnitude of the tax's impact on each.

The economic effect of the tax on the Tribe is minimal.[16] From 2004 to 2011, AC Coin had paid $69,894 in

---

[16] Both parties claim that we should disregard the magnitude of the tax in evaluating its economic effect on the Tribe, albeit for different reasons.

The Tribe asserts that any tax, regardless of its size, is impermissible. The Tenth Circuit has held that, under some circumstances, preemption analysis "cannot turn on the severity of a direct economic burden on tribal revenues caused by the state tax." *Indian Country, U.S.A., Inc. v. Okla. Tax Comm'n*, 829 F.2d 967, 986 n.9 (10th Cir. 1987). In *Indian Country*, the State taxed Indian sales of bingo tickets; the court held that IGRA's regulation of gaming itself is sufficiently comprehensive to prevent *any* tax on casino sales not accounted for in the

39

personal property tax.  After several years, at the Tribe's urging, AC Coin permitted the Tribe to reimburse it for this tax while this lawsuit was pending.  Assuming comparable taxes on WMS,[17] this leads to an approximate total tax of

compact.  *Id.*  In *Bracker*, the state sought to impose a motor carrier license tax and a use fuel tax on a subcontractor of a tribe's timber operations.  448 U.S. at 139.  The taxes burdened contracts for the sale of timber that were often "drafted by employees of the Federal Government," and the federal scheme Indian timber regulations were "so pervasive" that there was "no room for the[] taxes in the comprehensive federal regulatory scheme."  *Id.* at 147, 148.  While IGRA may prevent any tax on gaming itself, a tax on personal property possessed by a non-Indian on the reservation does not fall within IGRA's pervasive reach.  *Cf. Casino Res. Corp.*, 243 F.3d at 439; *Barona Band*, 528 F.3d at 1192.

The Town and the State assert that the tax has no actual economic effect on the Tribe.  Indeed, the record reflects that "the tax is not a factor in lease pricing" and that the vendors do not seek reimbursement from Tribal lessees.  Tribe Rule 56(a)(2) Statement 12-14.  Insofar as the Tribe challenges this assessment, it would constitute a "genuine dispute as to [a] material fact," Fed. R. Civ. P. 56(a); however, we construe the record as devoid of genuine dispute on this question, insofar as any effect on the Tribe is minimal compared to the other relevant interests.  Nevertheless, the Tribe did, pursuant to industry standard lease agreements, assume contractual *liability* for the taxes incurred by the vendors.  Deane Decl. 3-4.  The extent of the legal liability that the Tribe theoretically incurred is relevant, though not particularly weighty, to the calculation of the Tribe's interest, even if the Tribe's *actual* cost associated with the tax hinged upon the vendors' decision to seek the reimbursement to which they were lawfully entitled. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) (listing "run[ning] the risk of being assessed a [cost]" as a cognizable injury, even if it is not clear that the debtor will seek repayment).

[17] The actual amounts owed by WMS appear to vary substantially from year to year, but average approximately $10,000 for the years on record.

$20,000 per annum.[18] Although this is a substantial sum, it constitutes less than two tenths of one percent of the $2,300,000 (AC Coin) and $12,900,000 (WMS) in revenue per annum that the vendors anticipate from their dealings with the Tribe.

As of September 2011, the Tribe had invested over $1.42 billion in its gaming operations at Foxwoods. Many of the vendors' most popular games are available by lease only, and the Tribe has elected to pursue leases of a significant duration; however, the challenged tax does not significantly compromise the profitability of these leases. The Tribe's payments to the State of twenty-five percent of its gross operating revenues from video facsimile games have exceeded $1.5 billion since 2003. Even if the Tribe were forced to reimburse the vendors, $20,000 per year would not pose a substantial threat to the revenue the Tribe derives from the vendors' games, and it does not make the State the "primary beneficiary" of even this part of the Tribe's gaming operation. The tax's economic effect on the Tribe is less than minimal.

---

[18] The record also reflects that other slot machine vendors, including International Gaming Technology and Bally Technologies, regularly pay personal property taxes in Ledyard, but does not suggest how much they pay.

The tax has a moderate effect on tribal sovereignty. "A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is . . . well established." *Mescalero Apache*, 462 U.S. at 333. However, "[w]e long ago departed from the 'conceptual clarity of Mr. Chief Justice Marshall's view in *Worcester* [*v. Georgia*, 31 U.S. 515 (1832)]," "that Indian tribes were wholly distinct nations within whose boundaries 'the laws of a State can have no force.'" *Id.* at 331 (quoting *Worcester*, 31 U.S. at 561) (alterations omitted). The State's personal property tax, as imposed on the slot machines located entirely on-reservation, overlaps with the Tribe's ability to set the restrictions to property rights in its sovereign territory. "[U]nder some circumstances a State may exercise concurrent jurisdiction over non-Indians acting on tribal reservations." *Id.* at 333 (citations omitted). Still, this encroachment into an area of tribal sovereignty, however modest, is a recognized injury that must be considered in a *Bracker* balancing.

### iii. The State and Town Interests

In evaluating a State's economic interests for the purpose of *Bracker* balancing, we look for "a nexus between

42

the taxed activity and the government function provided. . . ." *Barona Band*, 528 F.3d at 1193; *see also Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1201 (10th Cir. 2011). In *Mescalero*, the challenged state regulation targeted hunting in particular; the Supreme Court considered State interests to be weaker because the State did not contribute to hunting or wildlife on the reservation. 462 U.S. at 341. Similarly, in *Ute Tribe*, the Tenth Circuit noted that the state taxes relating to extraction of oil and gas would be more defensible if the state used the tax's proceeds to provide related services to the Tribe. 660 F.3d at 1201.

"There is nothing unique in the nature of a [generally-applicable] tax . . . that requires a different analysis." *Ramah*, 458 U.S. at 843. However, for a generally-applicable tax, a court may credit the services provided by the State to the Tribe more generally as "related" to the tax. In *Cotton Petroleum*, 490 U.S. at 185, 189-91, the Supreme Court permitted application of a generalized tax on oil and gas production to on-reservation production, despite "evidence that tax payments by reservation lessees far exceed[ed] the value of services provided by the State to the lessees, or

43

more generally, to the reservation as a whole." *Id.* at 189. The Court reasoned that the State could point to "[t]he intangible value of citizenship in an organized society [that] is not easily measured in dollars and cents." *Id.* It also pointed out the "nightmarish administrative burdens" that would arise from requiring parity between state taxes and state services. *Id.* at 185 n.15.

In this case, the Town has a cognizable economic interest in imposing the tax. The Supreme Court has recognized "the dependency of state budgets on the receipt of local tax revenues" and "appreciate[s] the difficulties encountered by [local governments] should a substantial portion of [their] rightful tax revenue be tied up in" litigation. *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 527-28 (1981). The Town's economic interest therefore exceeds the value of the taxes on slot machines, insofar as a ruling favorable to the Tribe could invite other non-Indian owners of personal property on the reservation to initiate similar actions. According to the Town, the anticipated litigation from such an event would tie up hundreds of thousands of dollars per year. Hopkins Decl. ¶ 16. Moreover, if the legality of the tax hinges upon the

44

extent to which the taxed property is used by the Tribe in connection with Class III gaming - or other gaming at Foxwoods - the Town would need to take careful account of the *use* to which property owned by non-Indians on the reservation was put. This additional level of analysis would further frustrate the Town's revenue collection and would render the State's tax more difficult and expensive to administer.

There is a nexus between the tax and the services that the Town provides. The Town funds "the education and bussing [sic] of the Tribe's children" and "[t]he maintenance of the roads to the Reservation," *inter alia*. *Pequot II*, 2012 WL 1069342, at *12. A well-maintained road system that brings in the customers is the lifeblood of the Tribe's gaming activities. That the Tribe benefits from generalized governmental functions performed by the Town reinforces the validity of generalized taxes imposed by the Town on third parties with whom the Tribe elects to do business. *Cotton Petroleum*, 490 U.S. at 189. The Town's economic interest in the generally applicable tax is therefore connected, in some respect, to the generally available services that it provides.

45

The State has an interest in the uniform application of its tax code. Requiring the State to consider additional factors to determine the code's applicability would make it less predictable and more difficult to administer. Furthermore, "'states have a valid interest in ensuring compliance with lawful taxes that might easily be evaded.'" *Oneida Nation*, 645 F.3d at 165 (alteration omitted) (quoting *Milhelm Attea*, 512 U.S. at 73). The Tribe's decision to contractually obligate the vendors not to comply with any future personal property tax assessments required by State law undermines the State's sovereignty in a meaningful way. The likelihood of additional affronts to State sovereignty increases as the tax's application becomes more contingent upon the *use* to which non-Indian third parties put on-reservation property. The tax system already relies upon the honor code; refusal to pay taxes "erodes the public's perception of the equity of the system and has the potential of resulting in non-compliance with the reporting requirement." Hopkins Decl. ¶ 10.

Finally, a State has a separate sovereign interest in being in control of, and able to apply, its laws throughout its territory. *Cotton Petroleum*, 490 U.S. at 188. That

46

interest is diminished where, as here, the sole application of the state law at issue is on the Tribe's reservation, which occupies a unique status within the State.  Finally, if there is evidence of arbitrage or Tribal efforts to structure deals so as to avoid the State tax, the State's interests are stronger.  *See Barona Band,* 528 F.3d at 1193-94.

### iv.  Analysis

The Town and State have more at stake than the Tribe. The economic effect of the tax on the Tribe is negligible; its economic value to the Town is not.  The Tribe's sovereign interest in being able to exercise sole taxing authority over possession of property is insufficient to outweigh the State's interest in the uniform application of its generally-applicable tax, particularly where, as here, there is room for both State and Tribal taxation of the same activity.  *See Cotton Petroleum*, 490 U.S. at 188-89. Ultimately, applying a tax that covers all property in the State to non-Indian property located on-reservation is minimally intrusive.  We find the Supreme Court's holding in *Cotton Petroleum* to be highly instructive.  As in that case,

> [t]his is not a case in which the State has had
> nothing to do with the on-reservation activity, save

47

> tax it. Nor is this a case in which an unusually large state tax has imposed a substantial burden on the Tribe. It is, of course, reasonable to infer that the [State] taxes have at least a marginal effect on the [price of] on-reservation leases . . . . Any impairment to the federal policy favoring the [supremacy of the Tribe's role in gaming] that might be caused by these effects, however, is simply too indirect and too insubstantial to support [the Tribe's] claim of pre-emption. To find pre-emption of state taxation in such indirect burdens on this broad congressional purpose, absent some special factor such as those present in *Bracker* and *Ramah Navajo School Bd.*, would be to return to the pre-1937 doctrine of intergovernmental tax immunity. Any adverse effect on the Tribe's finances caused by the taxation of a private party contracting with the Tribe would be ground to strike the tax. Absent more explicit guidance from Congress, we decline to return to this long-discarded and thoroughly repudiated doctrine.

490 U.S. at 186-87.

We recognize that this is arguably a close case. However, the Tribe's generalized interests in sovereignty and economic development are not significantly impeded by the State's generally-applicable tax; neither are the federal interests protected in IGRA. The Town has moderate economic and administrative interests at stake, and the affront to the State's sovereignty on one hand approximates the affront to the Tribe's sovereignty on the other. The balance of equities here favors the Town and State.

48

### 3. Tribal Sovereignty Does Not Bar the Tax

The Tribe alleges that, independent of all else, tribal sovereignty poses another hurdle to the imposition of the tax. The Tribe relies on two categories of cases: the *Bracker* line, and the *Worcester* line. However, *Bracker* and its progeny only cite tribal sovereignty among the interests in a balancing test where the incidence of a tax does not fall on the Tribe. *See, e.g., Bracker*, 448 U.S. at 142-45; *see also Wagnon*, 546 U.S. at 101-02. Furthermore, cases such as *Worcester,* 31 U.S. 515, contain exactly the sort of "mechanical or absolute conceptions of state or tribal sovereignty" repudiated by *Bracker*. 448 U.S. at 145; *see also Mescalero Apache*, 462 U.S. at 331. Neither supports the Tribe's claim. Tribal sovereignty is an important consideration for a court weighing interests in the *Bracker* test, but it is insufficient in itself to bar the State's generally applicable tax imposed on non-Indians' ownership of on-reservation personal property.

## Conclusion

The district court was not barred — by Article III, the TIA, or comity doctrines — from reaching the merits of this case. However, the district court erred in determining that Connecticut's generally-applicable personal property tax was barred by the Indian Trader Statutes, by IGRA, and pursuant to the *Bracker* balancing test.

For the foregoing reasons, the opinion and order of the district court is **REVERSED** and the case is **REMANDED** with instructions to enter summary judgment in favor of Appellants.