# United States Court of Appeals
## For the Eighth Circuit
_____

No. 20-3441
_____

Flandreau Santee Sioux Tribe, a federally recognized Indian tribe

*Plaintiff - Appellee*

v.

Michael Houdyshell, Secretary of the Department of Revenue of the State of South Dakota, in his official capacity[1]; Kristi Noem, Governor of the State of South Dakota, in her official capacity

*Defendants - Appellants*
_____

Appeal from United States District Court
for the District of South Dakota - Southern
_____

Submitted: October 20, 2021
Filed: October 4, 2022
_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

This case returns to us for the second time, presenting the same issue: "whether a South Dakota tax on nonmember activity on the Flandreau Indian

---

[1]Michael Houdyshell is automatically substituted for his predecessor under Federal Rule of Appellate Procedure 43(c)(2).

Reservation [(the Reservation)] in Moody County, South Dakota is preempted by federal law." Flandreau Santee Sioux Tribe v. Haeder, 938 F.3d 941, 942 (8th Cir. 2019) (opinion of Loken, J.). We previously vacated the district court's grant of summary judgment in favor of the Flandreau Santee Sioux Tribe (the Tribe) on the basis that the tax is preempted, concluding "on the summary judgment record that the tax is not preempted." Id. On remand, and after a six-day video bench trial, the district court entered judgment in favor of the Tribe, concluding again that federal law preempts the imposition of the tax. Having jurisdiction under 28 U.S.C. § 1291, we reverse and remand.

## I.

This dispute centers on the State of South Dakota's (the State) imposition of an excise tax on work performed by a nonmember contractor hired by the Tribe in relation to a $24 million renovation and expansion of the Royal River Casino & Hotel, which the Tribe operates on the Reservation. Under South Dakota law, a 2% excise tax is applied to the gross receipts of a contractor if its services are enumerated in division c (construction) of the Standard Industrial Classification Manual of 1987 or if its services "entail the construction, building, installation, or repair of a fixture to realty" within the State. S.D. Codified Laws §§ 10-46A-1, -2, -2.2. While the tax is levied upon the contractor, the contractor may pass along the tax to its customers, here, the Tribe. S.D. Codified Laws § 10-46A-12. The Tribe asserts that this tax—totaling $384,436—cannot be imposed on the renovation and expansion project because the tax is preempted by federal law, specifically the Indian Gaming Regulatory Act (IGRA) and the Indian Trader Statutes.

In the earlier iteration of this case, the lead opinion recited the following facts, which are equally relevant to this appeal:

> The Tribe owns and operates the Royal River Casino & Hotel . . .
> on the Reservation, where it conducts "Class III gaming" such as table
> games and slot machines. As required by [IGRA], the Tribe and the
> State entered into a gaming compact that provides the terms under

-2-

which the Tribe is authorized to conduct Class III gaming at the Casino. See 25 U.S.C. § 2710(d). The Casino, opened in 1990 and relocated in 1997, operates in a building that houses a gaming floor, a hotel, a restaurant, a bar, a gift shop, a snack bar, and a live entertainment venue.

The Tribe planned and has partially implemented a $ 24 million renovation and expansion of the Casino, in part to compete with a newer, larger casino that opened nearby in 2011. To this end, the Tribe and the State agreed to double the number of slot machines allowed under the gaming compact. In October 2015, the Tribe contracted with a nonmember construction company, Henry Carlson Company, to carry out the planned renovation. It is undisputed that . . . Henry Carlson Company's construction services under this contract would be subject to the 2% excise tax if not performed on an Indian reservation. Cf. Valley Power Sys. v. S.D. Dep't of Revenue, 905 N.W.2d 328, 331 (S.D. 2017). The compact between the Tribe and the State is silent as to whether the State may impose the excise tax on a nonmember contractor performing construction services on the Casino's realty.

Construction on the Casino project began in December 2016. Certain construction projects within Indian country, such as construction of schools and tribal government buildings, are exempt from the excise tax, based on a project-by-project analysis by the South Dakota Department of Revenue using criteria developed by the State from federal preemption decisions. Henry Carlson Company twice requested an exemption for the Casino renovation project. Both requests were denied by the Department of Revenue, which does not grant exemptions for nonmember contractor work on "commercial" projects such as a casino. Henry Carlson Company then remitted the excise tax under protest and requested that the State refund the tax to the Tribe. See S.D. C[odified] L[aws §] 10-27-2. When the State denied the request, the Tribe filed this action in April 2017, seeking declaratory relief, an injunction, and a refund of the tax paid under protest.

Haeder, 938 F.3d at 943 (opinion of Loken, J.). After both parties moved for summary judgment, the district court granted the Tribe's motion in part, holding that IGRA preempts the imposition of the tax, either expressly or based on the balancing

-3-

test set forth in White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980). The district court dismissed, however, the Tribe's claim for a refund for lack of jurisdiction. The State appealed, and this Court reversed, holding that, on the summary judgment record, IGRA does not expressly preempt the tax and the Bracker balancing test does not demand preemption. Haeder, 938 F.3d at 945-47 (opinion of Loken, J.); id. at 947 (Colloton, J., concurring in the judgment). On remand, the district court held a six-day bench trial, after which it issued an order finding in favor of the Tribe. The district court determined that, while IGRA does not expressly preempt the tax, it preempts the tax under the Bracker balancing test, and, in the alternative, the Indian Trader Statutes preempt the tax both expressly and under the Bracker test. The State again appeals.

## II.

The State asserts that the district court erred in concluding that, under the Bracker balancing test, IGRA preempts the excise tax. The State also argues that the district court erred in alternatively concluding that the Indian Trader Statutes preempt the excise tax expressly and under Bracker. Following a bench trial, we review a district court's "legal conclusions de novo and factual findings for clear error." Howard v. United States, 964 F.3d 712, 716 (8th Cir. 2020) (citation omitted). In reviewing factual findings for clear error, "we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." Id. (citation omitted).

"'[A]bsent cession of jurisdiction or other federal statutes permitting it,' . . . a State is without power to tax reservation lands and reservation Indians." Okla. Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458 (1995) (first alteration in original) (citation omitted). "If the legal incidence of a state tax falls on a Tribe or its members for sales made within Indian country, . . . the tax is categorically unenforceable, without regard to its 'economic realities.'" Flandreau Santee Sioux Tribe v. Noem, 938 F.3d 928, 932 (8th Cir. 2019) (citation omitted). However, "[m]ore difficult

-4-

questions arise where . . . a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." Bracker, 448 U.S. at 144. "The Supreme Court in [Bracker] laid out a mode of analysis for courts to use" in this latter scenario. Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d 457, 467 (2d Cir. 2013).

"[T]wo 'independent but related' barriers" exist that can bar a state's imposition of a tax on a nonmember engaged in on-reservation activity: "state authority may be pre-empted by federal law, or it may interfere with the tribe's ability to exercise its sovereign functions." See Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue, 458 U.S. 832, 837 (1982) (citation omitted). In other words, while a state tax may be expressly preempted by federal law, "[f]ederal preemption is not limited to cases in which Congress has expressly preempted the state tax." Noem, 938 F.3d at 932. In cases where express preemption is not present, a state tax may nevertheless be preempted "because it 'unlawfully infringe[s] on the right of reservation Indians to make their own laws and be ruled by them.'" Ledyard, 722 F.3d at 467 (alteration in original) (citation omitted). "Such a tax is impermissible if 'the imposition of the tax fails to satisfy the Bracker interest-balancing test.'" Id. at 471 (citation omitted). Under Bracker, we "appl[y] a flexible analysis to determine whether state taxation of non-members on Indian land is proper." Noem, 938 F.3d at 932.

> Each case "requires a particularized examination of the relevant state, federal, and tribal interests." . . . [B]ecause of the long-recognized importance of tribal sovereignty, "questions of pre-emption in this area are not resolved by reference to standards of pre-emption that have developed in other areas of the law, and are not controlled by 'mechanical or absolute conceptions of state or tribal sovereignty.'" Instead, Indian tax immunity jurisprudence relies heavily on the "significant geographical component["] of tribal sovereignty,[] which "provides a backdrop against which the applicable treaties and federal statutes must be read."

Id. (citations omitted). "In conducting [the Bracker] analysis, we focus on 'the extent of federal regulation and control, the regulatory and revenue-raising interests

of states and tribes, and the provision of state or tribal services.'" <u>Haeder</u>, 938 F.3d at 945 (opinion of Loken, J.) (citation omitted). "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." <u>Noem</u>, 938 F.3d at 935-36 (quoting <u>New Mexico v. Mescalero Apache Tribe</u>, 462 U.S. 324, 334 (1983)). "Generally, 'a State seeking to impose a tax on a transaction between a tribe and nonmembers must point to more than its general interest in raising revenues.'" <u>Id.</u> at 932 (citation omitted).

As this Court has previously stated, the Supreme Court has used the <u>Bracker</u> balancing test to uphold some state taxes on nonmember commercial activities on tribal lands and has used the test to determine that some state taxes were preempted. <u>See</u> <u>id.</u>

> In <u>Bracker</u>, for example, the Court held that a State's use fuel tax on a nonmember's logging activity on tribal land was preempted by federal statutes and programs comprehensively encouraging and regulating logging on federal lands held in trust for Indians. In <u>Ramah</u>, the Court held that a State's gross receipts tax on a nonmember's activity in building a reservation school was preempted by the comprehensive federal regulation and financing of Indian education—the tax was based on a general desire to increase state revenues and provided no specific offsetting benefit to Indian education. By contrast, in <u>Cotton</u> [<u>Petroleum Corp. v. New Mexico</u>, 490 U.S. 163 (1989)], the Court upheld a State's severance tax on oil and gas produced by nonmember lessees from wells on reservation land because state regulation provided substantial services to the tribe and the lessees, no economic burden fell on the tribe, federal regulation was extensive but not exclusive, and there was no evidence the tax affected the tribe's ability to attract lessees. And in <u>Washington v. Confederated Tribes of Colville Indian Reservation</u>, 447 U.S. 134 (1980), the Court upheld *both* the tribe's sovereign power to tax cigarette sales to nonmembers on the reservation, and a state excise tax on vendors who provided cigarettes for on-reservation sales to nonmembers. The value of Indian sales to nonmembers was not generated by tribal activities, the Court explained, only by the exemption of such sales from state tax; neither

principles of federal Indian law nor any federal statute preempted the State from taxing this "artificial competitive advantage over all other businesses in a State."

Id. at 932-33 (citation omitted). With this framework in mind, we now turn to the question of whether IGRA or the Indian Trader Statutes preempt the excise tax.

## A.

We first consider whether the district court erred in concluding that IGRA preempts the imposition of the excise tax. As an initial matter, in its opinion, the district court correctly noted that, "[b]ased on the Eighth Circuit's opinion in this case on appeal and in Noem, . . . the contractor's excise tax is not expressly preempted by federal law." R. Doc. 186, at 23-24. Thus, the only issue relevant on appeal regarding IGRA is whether the tax is preempted under the Bracker balancing test, that is, "whether the State's interests in imposing the tax outweigh the relevant federal and Tribal interests." Noem, 938 F.3d at 935. The State asserts that the district court erred in concluding that the Bracker balancing test weighed in favor of preemption because (1) the extent of federal regulation and control through IGRA is minimal; (2) the tribal interests at stake here are minimal; and (3) the State has a significant interest in levying taxes, which are used for the benefit of its citizens, including tribal members.

### i.

First, we consider the extent of federal regulation and control of casino construction in IGRA. The district court noted that, in Haeder, we "held that the summary judgment record did not establish the State contractor's excise tax 'implicate[d] the relevant federal . . . interests'" because the provisions of IGRA that involved "the construction and maintenance of gaming facilities were not 'comprehensive and pervasive' federal regulation or control." R. Doc. 186, at 39-40 (alterations in original) (quoting Haeder, 938 F.3d at 945-46 (opinion of Loken, J.)). Nonetheless, the district court concluded that, while the lack of comprehensive and

pervasive federal regulation was insufficient for IGRA to expressly preempt the tax, "evidence at trial established that federal regulation under IGRA is extensive, illustrating the federal interest in the regulation and construction of Indian gaming facilities, as well as the federal interest in simultaneously promoting tribal self-sufficiency and tribal governance." R. Doc. 186, at 40. This conclusion is in error.

The district court's conclusion was based in part on its reliance on a specific IGRA provision, 25 U.S.C. § 2710, which, in subsections (b)(2)(E), (d)(2)(A), and (d)(2)(B), provides that a tribe must adopt, and the National Indian Gaming Commission Chairman must approve, absent specified exceptions, an ordinance or resolution stating that "the construction and maintenance of the gaming facility, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety." The district court concluded that § 2710(b)(2)(E) "is evidence of a strong federal interest in the adequate and safe construction of tribal gaming facilities, including the construction and renovation here of the Royal River Casino." R. Doc. 186, at 40. As the State notes, a single sentence regarding the construction and maintenance of a gaming facility can hardly be said to constitute extensive regulation over casino construction. Indeed, the Ninth Circuit has similarly concluded that "IGRA is a gambling regulation statute, not a code governing construction contractors, the legalities of which are of paramount state and local concern." Barona Band of Mission Indians v. Yee, 528 F.3d 1184, 1192 (9th Cir. 2008).

This single provision is unlike other federal regulatory schemes, like those governing Indian educational institutions, which are "comprehensive and pervasive." See Ramah, 458 U.S. at 839 ("Federal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive."). Section 2710(b)(2)(E), when considered against the extensive regulation that governs Indian educational institutions, simply does not evidence extensive federal regulation of casino construction. See Ramah, 458 U.S. at 839-41 ("The Federal Government's concern with the education of Indian children can be

-8-

traced back to the first treaties between the United States and the Navajo Tribe. Since that time, Congress has enacted numerous statutes empowering the [Bureau of Indian Affairs (BIA)] to provide for Indian education both on and off the reservation. . . . [25 U.S.C. § 450k] empowers the Secretary to promulgate regulations to accomplish the purposes of the [Indian Self-Determination and Education Assistance] Act. Pursuant to this authority, the Secretary has promulgated detailed and comprehensive regulations respecting 'school construction for previously private schools now controlled and operated by tribes or tribally approved Indian organizations.'" (footnote omitted) (citation omitted)).

The district court also discussed "the federal interests at issue in this case[, which] are articulated within the text of IGRA." R. Doc. 186, at 38. Section 2702 provides that the purpose of IGRA is:

> (1) to provide a statutory basis *for the operation of gaming* by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;
>
> (2) to provide a statutory basis *for the regulation of gaming* by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and
>
> (3) to declare that the establishment of independent Federal regulatory authority *for gaming* on Indian lands, the establishment of Federal standards *for gaming* on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

(emphases added). Although § 2702 undoubtedly describes the federal interests advanced by IGRA, the district court ignored the fact that the stated purposes are "for the operation of gaming," "for the regulation of gaming," and "for gaming," not for all activities tangentially related to gaming. Id. § 2702; see also Casino Res.

Corp. v. Harrah's Ent., Inc., 243 F.3d 435, 439 (8th Cir. 2001) ("Not every contract that is merely peripherally associated with tribal gaming is subject to IGRA's constraints."). Standing alone, or even in combination with § 2710(b)(2)(E), § 2702 does not demonstrate that federal regulation of tribal casino construction is pervasive or extensive.

The evidence that the district court heard at trial does not change the fact that there is no extensive federal regulation governing the construction of casinos on tribal land. In its opinion, the district court described at great length the involvement (or lack thereof) of the Tribe, the State, and federal agencies in the renovation project. Specifically, the district court noted that the evidence demonstrated that: there was no State inspection or maintenance of the Casino; federal and tribal agencies conducted all inspections; all regulatory involvement in the Casino renovation came from federal or tribal agencies; "[b]oth IGRA and the Tribe's [gaming] Ordinances require the Tribe's gaming regulators and Casino management to certify that the Casino is built and maintained in a manner that protects the safety and health of the public and patrons and the environment"; the Tribal Gaming Commission, which is the tribal agency charged with oversight of all gaming activities, did not submit construction plans to the National Indian Gaming Commission (NIGC) for approval, but nevertheless submitted a copy of the facility license to the NIGC attesting that the facility construction, maintenance, and operation adequately protected the public health and safety; the State did not provide any "help, funds, training, or inspections"; the Tribe provided "the daily supervision and security" for the project; tribal and federal agencies issued all the licenses or permits, with the exception of one electrical permit; renovations "were essential to benefit the health and safety of Indian gaming patrons and workers"; roughly $6 million of project financing came through Tribal Economic Development Bonds; and the State's only regulatory authority under the gaming compact between the Tribe and the State is to inspect the "slot machines for compliance with state and tribal gaming laws." R. Doc. 186, at 41-48. After discussing this evidence, the district court concluded that

both federal regulation under IGRA and tribal regulation under the Tribe's laws of the Casino renovation were substantial and extensive, especially when compared to the lack of State regulation. The evidence showed a scheme of federal and tribal regulation of Indian gaming facilities that leaves a minimal role for State oversight of the renovation project.

R. Doc. 186, at 49.

Although this detailed description of the level of tribe, state, and federal involvement in the renovation project is certainly illustrative as to how the renovation project proceeded, the fact remains that, even if § 2710(b)(2)(E) may tangentially touch the construction and renovation project, IGRA is not designed to, nor does it aim to, control construction of tribal casinos. The level of federal involvement in this renovation project does not demonstrate that it occurred due to the dictates of IGRA;[2] the use or involvement of federal entities throughout the project does not mean that IGRA provides extensive regulatory control. Submission to general federal oversight or involvement in the renovation process stands in stark contrast to instances where the Supreme Court has deemed that a specific statutory or regulatory scheme imposes specific obligations on the construction of specific institutions or on contractual agreements. In Ramah, the Supreme Court detailed the factors underlying its determination that "[f]ederal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive," specifically, the BIA's "wide-ranging authority [under the Indian Self-Determination and Education Assistance Act and associated regulations regarding school construction] to monitor and review the subcontracting agreements between the Indian organization, which is viewed as the general contractor, and the

_____

[2]By way of example, the district court discussed the testimony of Stephen Nelson, Compliance Officer for the Casino. Nelson testified about the inspections conducted by Indian Health Services during the course of and upon completion of the project. R. Doc. 189, at 234-236. Although these inspections demonstrate federal oversight of the project, there is no suggestion that they were mandated by IGRA.

non-Indian firm that actually constructs the facilities." 458 U.S. at 839-41. The Supreme Court went on to detail the applicable regulatory requirements, including that

> the BIA must conduct preliminary on-site inspections, and prepare cost estimates for the project in cooperation with the tribal organization[,] . . . must approve any architectural or engineering agreements executed in connection with the project[,] . . . [and may] require that all subcontracting agreements contain certain terms . . . . Finally, to ensure that the Tribe is fulfilling its statutory obligations, the regulations require the tribal organization to maintain records for the Secretary's inspection.

Id. at 841. Relatedly, in Bracker, the Supreme Court held that federal law preempted a state motor carrier license and fuel tax on a nonmember logging company engaged in activity on tribal land because the BIA was involved in nearly every aspect of harvesting Indian timber. 448 U.S. at 145-48. Specifically, the Secretary of the Interior had "broad authority over the sale of timber on the reservation," and the Secretary and BIA extensively regulated contracts between tribal members and nonmembers performing work on the reservation in the form of a detailed bidding procedure, mandatory terms to be included in each contract, and overall approval of all contracts by the Secretary. Id. at 145-47. There is simply no such statutory or regulatory scheme dictating federal involvement over casino construction here. Given these guideposts from the Supreme Court, even with the evidence that the district court heard at trial, we cannot conclude that the federal regulation in IGRA regarding casino construction is extensive.

We are similarly unconvinced by the district court's conclusions regarding the federal interest in "[p]romoting [t]ribal [e]conomic [d]evelopment, [e]nsuring that the Tribe is the [p]rimary [b]eneficiary of [g]aming, and [p]rotecting [g]aming as a [m]eans of [g]eneral [t]ribal [r]evenue." R. Doc. 186, at 52. We agree with the observation in Haeder that, with respect to these interests, "the generally applicable excise tax is a one-time tax on nonmember contractor construction services in expanding and renovating the Casino's realty, some of which are performed off the

reservation. This tax hardly implicates the relevant federal and tribal interests." 938 F.3d at 946 (opinion of Loken, J.). Nothing in the district court's detailed explanation of these interests counters this point: the excise tax is a one-time tax that is not aimed at regulating tribal gaming. The district court determined that the evidence at trial "established that the effects of the excise tax are not 'a one-time tax'" because, if the Tribe were not required to pay the excise tax, it could have purchased additional slot machines, which would have had a continuous effect of increasing tribal revenue. However, the connection between the tax and an increase in revenue from additional slot machines is too attenuated to conclude that the excise tax is not a one-time tax or that it "substantially undermines the Tribe's ability to generate revenues from . . . gaming." R. Doc. 186 at 52-54; see also Cotton, 490 U.S. at 187 ("Any impairment to the federal policy . . . that might be caused by these effects, however, is simply too indirect and too insubstantial to support Cotton's claim of pre-emption."). As "[n]othing within IGRA reveals congressional intent to exempt" nonmember construction contractors "from generally applicable state taxes that would apply in the absence of the legislation," see Ledyard, 722 F.3d at 473, these stated federal interests are not implicated by the excise tax.

ii.

Second, as we concluded in Haeder, the tribal interests are minimal, and the State has a significant interest in raising revenues for essential government services. We agree with the lead opinion's recitation of the stated purpose of IGRA in § 2702 and its statement that

> [b]ecause the Tribe has failed to show that the tax has more than a *de minimis* financial impact on federal and tribal interests, as in Ledyard, 722 F.3d at 476-77, the State's legitimate interests in raising revenues for essential government programs that benefit the nonmember contractor-taxpayer in this case, as well as its interest in being able to apply its generally applicable contractor excise tax throughout the State, are sufficient to justify imposing the excise tax on Henry Carlson Company's construction services performed on the Casino's realty.

-13-

Haeder, 938 F.3d at 946-47 (opinion of Loken, J.). In reaching this conclusion, it is "[m]ost significant[]" that "the Tribe ha[d] presented no evidence that imposition of the contractor excise tax for Henry Carlson Company's work on the Casino project will impede the Tribe's ability to conduct its Class III gaming activities to generate gaming revenue." Id. at 946. On the summary judgment record, the amount of the excise "tax pale[d] in comparison" to the Casino's annual revenues. "Absent a showing that the effect of this one-time tax on construction would be to reduce the demand for the Casino's commercial activities, this indirect financial burden was 'simply too indirect and too insubstantial to support [the Tribe's] claim of preemption.'" Id. (third alteration in original) (citation omitted). Even considering the entire trial record, this conclusion remains in full force.

a.

Regarding the tribal interests, we first consider the financial burden that the excise tax imposes on the Tribe. On remand, the district court determined that the Tribe had shown more than a *de minimis* financial burden, concluding that "the Tribe was deprived of at least $1.24 million . . . in gaming revenue." R. Doc. 186, at 65. However, this lost revenue amount is based on speculation that, had the Tribe not been forced to pay the $384,436 excise tax to the State, it would have used its funds to purchase 19 additional slot machines, and the additional machines would have brought in revenue of approximately $1.24 million annually, representing a 10% increase in the Casino's earnings. See R. Doc. 189, at 168 ("[I]t's about [$]1.245 million for the year. . . . That would just be based on the 19 machines that we speculate we would have purchased."); R. Doc. 189, at 185 ("We've already identified some slot machines that we would like to purchase . . . ."). More significantly, even if it were a certainty that the Tribe would have used the amount of the excise tax to purchase 19 new slot machines, resulting in a $1.24 million revenue increase, this financial impact of the tax remains "too indirect" and "too insubstantial" to weigh in favor of preemption. See Cotton, 490 U.S. at 186-87 & n.17 (concluding that impact of tax was "too indirect" and "too insubstantial" to warrant preemption where state tax had "a marginal effect" on the demand for and

-14-

value of on-reservation leases as well as the Tribe's ability to increase its tax rate and did not involve "extraordinarily high" or "unusually large state tax" or generate "enormous revenues" (citation omitted)). Just like the tax impacts in Cotton, any projected lost revenue is an indirect consequence of the tax, and there is no evidence that the tax amount is "extraordinarily high" or is used by the state to collect "enormous revenues." See id. at 186 n.7 (citation omitted).

In addition to concluding that the $1.24 million figure constituted a financial burden on the Tribe weighing in favor of preemption, the district court concluded that this lost revenue amount demonstrated that the excise tax interfered with the Tribe's interest in its economic development because

> [t]he funds that the Tribe would use to pay the State tax and the significant gaming revenue of at least $1.24 million dollars that the Tribe loses as a result of the State excise tax impacts the Tribe's ability to economically develop and provide essential government services both on and off-reservation.

R. Doc. 186, at 72. Just as this purportedly lost revenue amount is too indirect and too insubstantial to constitute a financial burden weighing in favor of preemption, it is also too indirect and too insubstantial to constitute interference with the Tribe's interest in economic development. Given the foregoing, we conclude that "the Tribe has failed to show that the tax has more than a *de minimis* financial impact on . . . tribal interests." 938 F.3d at 947 (opinion of Loken, J.). In the absence of more concrete evidence, we find that the district court erred in concluding that these tribal interests weighed in favor of preemption.

As to the other tribal interests that the district court found weighed in favor of preemption—the tax's interference with the Tribe's right to self-determination, self-governance, and sovereignty—we conclude that the district court erroneously found that these interests weighed in favor of preemption. First, the district court concluded that the tax impedes the Tribe's interest in self-determination by hampering its ability to fully realize its gaming revenue and allocate funds from such

revenue where the Tribe so desired.  But as the State notes, a reduction in tribal revenue cannot alone serve to invalidate the tax.  See Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 114 (2005) (explaining that "downstream economic consequences," such as "a decrease in [a tribe's] revenues," are insufficient to invalidate a tax); Crow Tribe of Indians v. Montana, 650 F.2d 1104, 1116 (9th Cir. 1981), opinion amended on denial of reh'g, 665 F.2d 1390 (9th Cir. 1982) ("It is clear that a state tax is not invalid merely because it erodes a tribe's revenues, even when the tax substantially impairs the tribal government's ability to sustain itself and its programs.").

Second, the district court concluded that the excise tax interferes with the Tribe's Tax Act[3] and thus the Tribe's right to self-governance.  According to the Tribe, the only way that it can obtain relief from the excise tax is to impose its own excise tax on construction within the Reservation and then enter into a tax collection agreement[4] with the State, allowing the Tribe to retain some or all of the collected excise tax in the same manner as it does with respect to taxes collected on cigarettes sold on the Reservation.  See R. Doc. 191, at 41.  The district court concluded that

---

[3]As the district court noted, "The Tribe has an extensive civil and criminal code that governs conduct within the Tribe's jurisdiction, including a tribal Tax Act . . . . The Tribe's Tax Act regulates taxation within tribal jurisdiction, imposing tribal sales and use tax, motor vehicle fuel tax, and taxes on cigarettes, utilities, communication, and other products."  R. Doc. 186, at 67-68.

[4]Under South Dakota law, the Tribe may enter into a tax collection agreement with the State, which allows the Tribe and State to negotiate which party retains which portions of a collected tax, provided that the Tribe imposes the same type of tax under its Tax Act as the State does under its tax code.  See S.D. Codified Laws § 10-12A-5 ("A tax collection agreement between the [D]epartment [of Revenue] and an Indian tribe may provide, if agreed upon by the parties, that a fixed percentage of the total annual state and tribal tax proceeds from an area of Indian country shall be remitted to the Indian tribe in lieu of the exact amount of the revenue collected as a result of the imposition of tribal taxes."); see also S.D. Codified Laws § 10-12A-4.  ("These agreements may provide for the collection of any of the following state taxes and any tribal taxes imposed by a tribe that are identical . . . .").

this dilemma—requiring the Tribe to impose a tax on itself or forego a tax agreement with the State—amounts to interference with the Tribe's right to self-governance. We disagree. The existence of a financial incentive for the Tribe to choose to enact an excise tax under its Tax Act does not interfere with the Tribe's interest in self-governance because the ultimate decision of whether to impose an excise tax, or any other tax, or refrain from imposing of a particular tax, belongs to the Tribe.

Third, the district court further concluded that the tax interfered with the Tribe's interest in self-governance because it impacted the Tribe's ability to operate at the full capacity authorized under the gaming compact, which authorized up to 1,000 slot machines. The district court reasoned that the tax hindered the Tribe's ability to purchase additional slot machines and, thus, impeded the Tribe's interests as negotiated in the gaming compact. However, as previously stated, this impact is indirect, see Cotton, 490 U.S. at 187, and is also speculative, particularly where evidence suggests other reasons that the Tribe is not operating at the full level of slot machines allowed under the compact, see R. Doc. 189, at 188 ("We're sitting around the same number [of slot machines as before the expansion project]. We brought some new machines in, taken some machines out. We have a plan to increase the machines moving forward. Unfortunately, COVID got in the way of those plans and the necessary resources of the 384,000 that the State is seeking.").

Finally, the district court concluded that the tax interfered with the Tribe's ability to self-govern by impeding the Tribe's performance of essential government functions because, due to other tribal buildings' state of disrepair, the Tribe needed to use the Casino administration building for tribal government meetings. According to the district court, the tax impacted construction of the administrative building at the Casino, which the Tribe needs to conduct government meetings. This consequence of the tax is another indirect and downstream effect that cannot provide a basis for preemption. Cf. Cotton, 490 U.S. at 187 (rejecting impairment to federal interests as "too indirect and too insubstantial to support . . . pre-emption"). The tribal interests thus do not weigh in favor of preemption, and the district court erred in concluding that they did.

-17-

b.

As to the State's interests, "[t]he exercise of State authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity." Mescalero, 462 U.S. at 336. The district court concluded that the State's interests in levying the excise tax—reimbursement for State-provided services, raising revenue for the State's general fund via the excise tax, and uniform application of South Dakota tax law—were insufficient to justify the excise tax because the State could "only demonstrate a general interest in raising revenue." R. Doc. 186, at 99. This was in error.

The district court first determined that the State's interest in being reimbursed for the services it provided was minimal because the State failed to establish that sufficient State services, funded through the general fund, were used in connection with the construction project. We disagree with the district court to the extent that it concluded that the State was required to demonstrate that the excise tax would be used directly for the benefit of the Tribe, its members, or Henry Carlson Company and its employees in connection with the renovation project. "[F]or a generally-applicable tax, a court may credit the services provided by the State to the Tribe more generally as 'related' to the tax," Ledyard, 722 F.3d at 475, and the evidence at trial demonstrated that the State's general fund provides various services throughout South Dakota, including Moody County where the Casino is located, that generally benefit the Tribe, its members, and Henry Carlson Company and its employees. Among these services is the funding of general operations of school districts, funding of nutritional programs for school breakfasts and lunches, and maintenance of the State's colleges and special schools. More significantly, the State uses money from the general fund to provide matching state aid for federal social services like health insurance for children and the administration of federal programs like Medicaid. These services are generally available to tribal members and employees of Henry Carlson Company, and while they are not directly related to the construction project, they nevertheless represent a strong state interest in

-18-

implementing the tax. See id. (stating that the Supreme Court has permitted tax levied against reservation lessees that exceeded the value of services provided generally to the reservation, while noting the state's interest in "[t]he intangible value of citizenship in an organized society [that] is not easily measured in dollars and cents" and cautioning against the "'nightmarish administrative burdens' that would arise from requiring parity between state taxes and state services" (alterations in original) (quoting Cotton, 490 U.S. at 185 n.15, 189)).

Next, as to the State's interest in raising revenue for the general revenue fund, the parties acknowledge that raising revenue is a legitimate state interest. Yee, 528 F.3d at 1192-93. However, "the state interest strengthens where there is a nexus between the taxed activity and the government function provided." Id. at 1193. We do not disagree with the district court that there was no clear nexus between the taxed activity and the government functions provided. But we disagree with the district court that the State provided nothing of value in return for the tax because the State provided generally available benefits to its residents, which includes tribal members and employees of Henry Carlson Company. Given the provision of government services that we have just detailed, we conclude that "the absence of a more specific nexus, while relevant, is not a controlling factor." Haeder, 938 F.3d at 947 (opinion of Loken, J.).

The district court also determined that the State's interest in raising revenue for the general fund through the excise tax was minimal because the loss of the amount of tax imposed—$384,436—would have had a small impact on the State's overall budget. But in reaching this conclusion, the district court appears to have ignored the fact that we have already concluded that the State has a "significant interest in raising revenue for its general fund to provide services to residents including . . . Henry Carlson Company." Id. at 946. "The State . . . has a legitimate governmental interest in raising revenues," Colville, 447 U.S. at 157, regardless of the amount collected on a specific application of a generally applicable tax. While this interest may be stronger if the tax in question comprised a more significant

-19-

portion of the budget, the interest is not completely undermined solely because the tax forms a small portion of the overall general fund.

Finally, as to the State's interest in uniformly applying its tax laws across the State, the district court concluded that this interest did not weigh against preemption because evidence of differing tax agreements between the State and various tribes demonstrated that the excise tax was not applied uniformly across those tribes that requested tax exemptions. Trial testimony from Bobi Adams, Deputy Director in Administration with the South Dakota Department of Revenue, established that the State grants "very few exceptions" to the imposition of the excise tax. R. Doc. 190, at 185. Adams explained that, in determining whether the excise tax applies, the State considers whether "the project occur[s] within the State of South Dakota . . . [.] And if it d[oes], then the contractor's excise tax applies," before noting that tribal projects may impose some unique considerations due to tribes' abilities to levy their own taxes. R. Doc. 190, at 172, 185. While this testimony establishes that the State grants limited exceptions to the tax in the unique circumstances presented by projects in Indian country, it nonetheless does not undermine the State's interest in administering its tax code and applying taxes without additional case-by-case exceptions. See Ledyard, 722 F.3d at 475-76 ("The State has an interest in the uniform application of its tax code. Requiring the State to consider additional factors to determine the code's applicability would make it less predictable and more difficult to administer."). The district court's failure to recognize this as a significant state interest was thus in error. Given the foregoing, it was erroneous for the district court to conclude that the State's interests were minimal and weighed in favor of preemption.

iii.

In sum, even with a more factually developed record than we considered on summary judgment, the Bracker balancing test does not weigh in favor of preemption under IGRA because the extent of federal regulation over casino construction on tribal land is minimal, the impact of the excise tax on the tribal

-20-

interests is minimal, and the State has a strong interest in raising revenue to provide essential government services to its citizens, including tribal members. The district court thus erroneously entered judgment in favor of the Tribe based on IGRA's preemption of the excise tax.

B.

We next consider whether the district court erred in concluding that the Indian Trader Statutes preempt the imposition of the excise tax. The State asserts that the district court erred in concluding that they do because, first, the Indian Trader Statutes do not apply to the contract between the Tribe and Henry Carlson Company because the contract was for services, not goods, and Henry Carlson Company is not a licensed Indian trader. The State next asserts that, even if the statutes apply, the district court erroneously concluded that the statutes preempt the tax either expressly or under Bracker because the statutes do not evince any congressional intent for preemption and do not provide the requisite comprehensive and pervasive federal regulation.

The Indian Trader Statutes, first enacted in 1790, Central Machine Co. v. Arizona State Tax Commission, 448 U.S. 160, 163 (1980), were designed to "prevent fraud and other abuses by persons trading with Indians," Department of Taxation & Finance of N.Y. v. Milhelm Attea & Bros., 512 U.S 61, 70 (1994). "The statutes give the Commissioner of Indian Affairs seemingly broad power to regulate trade with Indian tribes." Sac & Fox Nation of Mo. v. Pierce, 213 F.3d 566, 581 (10th Cir. 2000). Under the statutes, the Commissioner has the power to appoint traders with Indian tribes and to implement rules governing the quantity and prices of goods sold to Indians; individuals approved by the Commissioner are permitted to trade with Indians on an Indian reservation, pursuant to the rules set by the Commissioner; the President is vested with the power to revoke an individual's status as an Indian trader; and a penalty scheme is implemented for any traders who engage in trade with Indians without obtaining the requisite license, 25 U.S.C. §§ 261-264.

-21-

We need not resolve the State's argument about the applicability of the Indian Trader Statutes to the contract between the Tribe and Henry Carlson Company because, even assuming that they apply, we conclude that they do not preempt the excise tax, either expressly or under the Bracker balancing test.

i.

As to express preemption, the Supreme Court has previously held that the Indian Trader Statutes broadly preempt a state's attempt to levy a tax on Indian traders. In Warren Trading Post Co. v. Arizona State Tax Commission, the Supreme Court held that the statutes barred a state tax on federally licensed retail Indian traders "on their sales to reservation Indians on a reservation." 380 U.S. 685, 690 (1965). However, in more recent examinations of the Indian Trader Statutes, the Supreme Court has "backed away" from its previous broad interpretations. See Ledyard, 722 F.3d at 468. Indeed, in Milhelm, the Supreme Court explicitly stated that "[a]lthough language in Warren Trading Post suggests that no state regulation of Indian traders can be valid, our subsequent decisions have 'undermine[d]' that proposition" and held that "Indian traders are not wholly immune from state regulation that is reasonably necessary to the assessment or collection of lawful state taxes." 512 U.S. at 71, 75 (second alteration in original) (citation omitted).

Post-Milhelm, the Tenth Circuit, in Pierce, held that a generally applicable motor fuel tax that Kansas imposed on motor fuel sold by a distributor to a tribe's retail gas stations was not expressly preempted by the Indian Trader Statutes. 213 F.3d at 583. In reaching this conclusion, and recognizing that "in Milhelm Attea, the [Supreme] Court narrowed its interpretation of the trader statutes," the Tenth Circuit stated:

> Unlike Warren Trading and its progeny, the Kansas motor fuel tax law does not impose a tax upon retail traders for trading with Indians. . . . [And] no comprehensive federal regulatory scheme governs the wholesale distribution of motor fuel to Indian tribes. Rather, the Kansas motor fuel tax law imposes a non-discriminatory tax on all wholesale

> fuel distributors for fuel distributions to retailers within the State of Kansas—Indian or otherwise. Nothing in the record indicates the Tribes' distributors distribute all their fuel, or even a significant portion of it, to the Tribes. Thus, the threat of the distributors perpetrating fraud or abuse upon the Tribes appears negligible. Based upon the foregoing authorities, we conclude that the Indian Trader Statutes do not so pervade the field that they preempt the Kansas motor fuel tax, the legal incidence of which falls upon the distributors and which imposes only an indirect burden on the Tribes.

Id. at 581-83 (citations omitted). We find Pierce persuasive and conclude that the excise tax is similar in kind to the one the Tenth Circuit upheld in Pierce. First, there is simply no comprehensive and pervasive regulatory scheme governing casino construction projects that can be found in the Indian Trader Statutes. It is immaterial to this analysis whether the Indian Trader Statutes impose any obligations on contractors because the fact remains that the Indian Trader Statutes are not a comprehensive federal regulatory authority on casino construction projects. Further, just like the motor fuel tax in Pierce, the excise tax is a non-discriminatory tax that is applied on all gross receipts of contractors who perform construction work across South Dakota, and there is no evidence in the record suggesting that Henry Carlson Company performs its work only for the Tribe. And, while the financial burden of the tax can fall on the Tribe, it is assessed against the contractor, and then passed on to the Tribe, which constitutes an indirect burden, similar to the tax in Pierce. Finally, although Henry Carlson Company performed the work on the Reservation, so that the transaction was an on-reservation transaction, we find that the other factors we have identified make this tax akin to the one in Pierce, particularly when we consider that the Supreme Court has seemingly moved away from a more rigid application of the Indian Trader Statutes. See Milhelm, 512 U.S. at 75. Based on the foregoing, "we conclude that the Indian Trader Statutes do not so pervade the field that they preempt" the excise tax. See Pierce, 213 F.3d at 583. The district court thus erred in concluding that the Indian Trader Statutes expressly preempt the excise tax.

ii.

Moving to whether the Indian Trader Statutes preempt the excise tax under the Bracker balancing test, we conclude that the district court erroneously determined that they do. First, the statutes evince minimal, if any, federal regulation or control of casino construction. The Indian Trader Statutes provide extensive regulation and control over just that: *trading*. That the Indian Trader Statutes may in some way touch upon casino construction by imposing certain licensing requirements on those who perform work on the project hardly demonstrates an extensive federal regulatory scheme to regulate casino construction. Cf. Harrah's, 243 F.3d at 439 ("Not every contract that is merely peripherally associated with tribal gaming is subject to IGRA's constraints."). Further, as we concluded with respect to IGRA, the involvement of federal entities in the project, by performing inspections, for example, does not turn the Indian Trader Statutes into an extensive mechanism of federal regulation over casino construction.

As to the federal and tribal interests, our aforementioned conclusions regarding the relevant federal and tribal interests with respect to IGRA are relevant to the same inquiry with respect to the Indian Trader Statutes. The statutes specifically reference "the protection of said Indians," § 262, and the Supreme Court has discussed "the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts." Warren Trading Post, 380 U.S. at 691. Just as we concluded with respect to IGRA, we again conclude that "the generally applicable excise tax is a one-time tax on nonmember contractor construction services in expanding and renovating the Casino's realty, some of which are performed off the reservation. This tax hardly implicates the relevant federal . . . interests." Haeder, 938 F.3d at 946 (opinion of Loken, J.). Without any congressional intent evincing that a nonmember contractor should be exempt from the generally applicable excise tax, which would apply in the absence of the Indian Trader Statutes, the federal interest here of protecting Indians engaged in trading on reservations are simply not implicated.

Specifically as to the tribal interests, the district court concluded that the tribal interests in economic development and fair dealing, as well as monitoring and regulating its commercial partners, weighed in favor of preemption. Again, this was in error. As to the interest in economic development and fair dealing, just as with its IGRA claim, here the Tribe has failed to show that "the tax has more than a *de minimis* financial impact on . . . tribal interests," because "[a]bsent a showing that the effect of this one-time tax on construction would be to reduce the demand for the Casino's commercial activities, this indirect financial burden is 'simply too indirect and too insubstantial to support [the Tribe's] claim of preemption.'" Id. at 946-47 (third alteration in original) (quoting Cotton, 490 U.S. at 187). And while the Tribe has an interest in monitoring and regulating its commercial partners, we disagree with the district court that "the purpose and objectives of the Indian Trader Statutes are frustrated by the State excise tax" because it puts a financial burden on the Tribe, which "could thereby disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable." R. Doc. 186, at 115 (citation omitted). Because the Tribe has failed to show that the financial burden of the excise tax is more than *de minimis*, we cannot conclude that the tribal interest in monitoring and regulating its commercial partners based on the financial burden to the Tribe weighs in favor of preemption.

Finally, the State's interests in levying the excise tax are the same as they are with respect to IGRA. For the reasons stated in Part II.A.ii.b., we conclude that

> the State's legitimate interests in raising revenues for essential government programs that benefit the nonmember contractor-taxpayer in this case, as well as its interest in being able to apply its generally applicable contractor excise tax throughout the State, are sufficient to justify imposing the excise tax on Henry Carlson Company's construction services performed on the Casino's realty.

Haeder, 938 F.3d at 947 (opinion of Loken, J.). Given the foregoing, the Bracker analysis guides us to conclude that preemption of the excise tax by the Indian Trader

Statutes is inappropriate.  The district court thus erred in granting judgment to the Tribe on this basis.

## III.

For the foregoing reasons, we reverse and remand with instructions to enter judgment in favor of the State.

KELLY, Circuit Judge, dissenting.

## I.

A state tax may be preempted if it "interfere[s] with the tribe's ability to exercise its sovereign functions."  Ramah, 458 U.S. at 837.  To assess whether a tax unlawfully interferes with the tribe's ability, the Bracker balancing test requires a "flexible analysis" and a "particularized examination of the relevant state, federal, and tribal interests" in each case.  Noem, 938 F.3d at 932 (quoting Ramah, 458 U.S at 838); see also Cotton, 490 U.S. at 176 (discussing that preemption analysis must be "sensitive to the particular facts and legislation involved").  The district court carefully undertook that particularized examination, hearing evidence from the Tribe and the State during a six-day bench trial.  I see no clear error in the district court's factual findings or error in its legal conclusions.  I would affirm.

### A.  Federal Interests

Based on the evidence at trial, the district court determined there was extensive federal involvement under IGRA.  The district court found that all regulatory involvement and inspections during the project were conducted by federal and tribal agencies, that $6 million of project financing was funded by federal bonds, and that many of the renovations were essential to the public health and safety of Indian gaming patrons and workers.  In light of these findings, the district court concluded there was "a strong federal interest in the construction and maintenance

of the Casino in a manner that adequately protects" the public and "promot[es] tribal self-sufficiency."

On appeal, the court acknowledges the evidence of extensive federal involvement but dismisses it as merely showing "how the renovation project proceeded," rather than showing that the involvement "occurred due to the dictates of IGRA." The point of the Bracker analysis, however, is to assess whether the state tax is implicitly preempted as indicated by the strength of federal and tribal interest in the matter. See Noem, 938 F.3d at 935 ("Of great relevance are the broad policies that underlie IGRA and the history of tribal independence in the operation of gaming and gaming facilities."). Even if IGRA did not dictate federal involvement, it allowed for that involvement by requiring federal oversight through resolution approvals, while also conferring discretion to the Tribe as to how the project was managed. See 25 U.S.C. §§ 2710(b)(2)(E), (d)(1). By facilitating federal involvement and encouraging tribal management, IGRA's statutory scheme promotes federal interests in both public safety as well as tribal self-sufficiency. The district court emphasized the extent of federal involvement in this particular project, including federal inspections under federal health and safety standards, federal permitting, and federal financing. In stark contrast, there was minimal state involvement in the project. The practical realities here are illustrative of the federal interests in IGRA. I would weigh the federal interests in favor of preemption.

*B. Tribal Interests*

When this case was first before us, the court determined there was insufficient evidence in the summary judgment record to establish the Tribe's interests. "Most significantly," the court reasoned, the Tribe "presented no evidence that imposition of the contractor excise tax . . . will impede the Tribe's ability to conduct its Class III gaming activities to generate gaming revenue." Haeder, 938 F.3d at 946.

The Tribe presented that evidence on remand, submitting financial documents and witness testimony to establish how it would have used the $384,436 taxed

amount. The district court found that the Tribe "would have purchased 19-20 additional gaming slot machines" because slot machines produce 80% of the casino's revenue, have a high return with low costs, and are "the most profitable use of the funds." The Tribe's funds were also restricted to certain uses because of bond financing limitations, further supporting that the funds would have been used for slot machines. Testimony established that the 19-20 slot machines "alone would have generated over $1.24 million dollars in revenue" in a single year, and that additional gaming revenue "represents at least a 10% increase in the Casino's earnings." And $1.24 million dollars was more than 25% of the Casino's net income transfer to the Tribe in 2019. Crediting this evidence, the district court found that the Tribe's revenue loss of $1.24 million dollars was substantial and concluded that the tax directly impaired the Tribe's ability to generate gaming revenue. Further, because the Tribe needed the additional slot machines to successfully compete with a newer, larger casino in the area, the district court found that the tax impaired the Tribe's ability to remain competitive.

The district court's findings were supported by substantial evidence in the record. The revenue loss and the reduction in demand for the Casino's offerings were not speculative findings, as the court suggests, but rather based on the testimony of multiple witnesses with direct knowledge of the project and the Casino's operations. Nor is the $1.24 million revenue loss "too indirect" or "too insubstantial" to weigh in favor of preemption. In Cotton, the tribe argued that the state tax on its oil and gas wells, which was imposed only on lessees and not passed onto the tribe, would interfere with its ability to raise its own taxes on lessees. 490 U.S. at 168–70, 176. But the tribe presented no evidence of that financial impact; indeed, the district court in Cotton "found that 'no economic burden f[ell] on the tribe by virtue of the state taxes,' and that the Tribe could, in fact, increase its taxes without adversely affecting on-reservation oil and gas development." Id. at 185–86 (cleaned up). In contrast, the district court here found a substantial economic burden on the Tribe: because of the tax, the Tribe could not purchase the additional slot machines it intended to, could not compete as successfully with the larger casino nearby, and lost sizeable gaming revenues that would have been generated from the

-28-

machines. And even setting aside the revenue loss from the additional slot machines, the district court found the $384,436 tax was passed onto the Tribe and was itself a substantial burden on the Tribe's budget. Because the district court's findings that the tax directly and substantially burdened the Tribe are not clearly erroneous, I would weigh the Tribe's interests in favor of preemption.

*C. State Interests*

"Generally, a State seeking to impose a tax on a transaction between a tribe and nonmembers must point to more than its general interest in raising revenues." Noem, 938 F.3d at 932 (cleaned up). The district court found that the State failed to make that showing: the record evidenced "complete abdication or noninvolvement of the State in the on-reservation activity." The State played no role in regulating the project, and it did not provide services used in connection with the project. Further, the district court found that the tax amount was only a "miniscule" percentage of the State's overall budget. The district court carefully examined the State's asserted interests in being reimbursed for services provided to the Tribe and the Henry Carlson Company, in raising revenue, and in applying the excise tax uniformly and equitably, and found them insufficient. These findings, too, are supported by substantial trial evidence, and weigh in favor of preemption.

II.

On remand, the Tribe presented evidence demonstrating extensive federal involvement in the project and a substantial financial burden on the Tribe. The district court made sound findings based on that evidence in a thorough, lengthy opinion, and I would affirm its conclusion that the excise tax at issue is preempted by federal law.[5]

---

[5]Because I would conclude that the excise tax is preempted by IGRA, I would not reach the question of preemption under the Indian Trader Statutes.

-29-

I respectfully dissent.

_____